**TELEGRAPH SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, et al., Defendants.**

**No. 80 C 2792.**

United States District Court, N.D. Illinois, E.D.

June 9, 1981.

On Motion for Modification Aug. 5, 1981.

See also D.C., 564 F.Supp. 880.

Baker & McKenzie, Chicago, Ill., for plaintiff.

Roger Flahaven, Michael J. Hayes, Jerome Webb, Asst. Attys. Gen., William J. Scott, Atty. Gen., Chicago, Ill., for Schilling.

Jeremiah Marsh, Robert W. Patterson, Michael F. Duhl, John L. Rogers, III, Peter F. Lovato, III, Hopkins, Sutter, Mulroy, Davis & Cromartie, U.S. Atty. Thomas P. Sullivan, Asst. U.S. Atty. Mary Ann Mason, Chicago, Ill., for FSLIC and Federal Home Loan Bank Bd.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiff brings this action to remove the Federal Savings & Loan Insurance Corporation ("FSLIC") as receiver of its assets and to obtain equitable relief for harm suffered as a result of the sale of those assets. Before the court is the motion for summary judgment of defendants Federal Home Loan Bank Board ("FHLBB") and FSLIC on Count III. The motion is granted in part and denied in part.

## I. FACTS

The uncontroverted facts are as follows. Telegraph Savings and Loan Association ("Telegraph" or "the Association") was a state chartered, federally insured savings and loan association. Several years prior to 1980, Telegraph began experiencing financial difficulties as a result of an adverse "spread" between the yield on its portfolio mortgages and the rising cost of money. Strasser Affid., ¶ 3. As a federally insured association, Telegraph was required by law to maintain reserve and net worth requirements as set forth in 12 C.F.R. § 563.13. In

1977 and again in 1978, it met these requirements only by earmarking paid-in surplus from the issuance of preferred stock. Roy Affid., ¶ 2. As of June 30, 1979, Telegraph failed to meet its minimum reserve requirement by $303,480.00 and had fallen short of its net worth requirement by $704,513.00. *Id.* For the six months ending June 30, 1979, the Association suffered losses in excess of $650,000.00 and logged a total loss for 1979 of $237,469.00. *Id.,* ¶ 3. As of June 30, 1979, Telegraph's net worth was set at $4,806,938.00. *Id.;* Conover Affid., Ex. 3 (8–26–80). Over the following ten months, Telegraph's net worth steadily declined to an April 30, 1980, level of $449,389.[1] Roy Affid., ¶¶ 3, 4; Conover Affid., Exhs. 2–13. In the month of April 1980 alone, the Association lost over $730,000.00. Conover Affid., Ex. 13. Telegraph's daily operational losses accelerated from $15,500.00 per day in February to $18,700.00 in March to $24,500.00 in April.

As a result of its financial difficulties, late in 1979 Telegraph became the subject of careful scrutiny by the Illinois Commissioner of Savings and Loan Associations ("the Commissioner"), the FHLBB and the FSLIC. As a result, a special meeting of Telegraph's Board of Directors was called on December 20, 1979, and was attended by the Deputy Commissioner of Savings and Loan Associations. At this meeting, Telegraph's president, William Strasser, reviewed the position of the Association and concluded that it "clearly was undercapitalized." Strasser also stated that various plans for the infusion of new capital were under consideration, including the sale of $3 million of preferred stock to a publicly held corporation. Nelson Affid., Ex. 2. The Deputy Commissioner responded that if Telegraph's financial condition did not improve by March 31, 1980, the Commissioner

would have to consider taking custody of the Association. *Id.*

Another special meeting of the Board was held on March 5, 1980, and was attended by the Commissioner who presented a number of resolutions intended to prevent the Association's financial demise. The minutes report that merger possibilities were discussed in detail. Nelson Affid., Ex. 3. The Commissioner stated that if no buyers appeared by March 31, 1980, he would be compelled to proceed with custody.

In the meantime, Telegraph's position had continued to deteriorate. On May 19, 1980, Telegraph's comptroller prepared reports projecting losses of over $590,000.00 for the period of May 1 to May 19 and losses of nearly $1 million for the entire month. Conover Affid., ¶ 3 (8–26–80). These losses, were they actually to occur, would have given Telegraph a substantial negative net worth by mid-May. It appeared that Telegraph would in fact suffer these losses when, on May 21, 1980, Virgil Seeley, Telegraph's executive vice-president and treasurer, informed the Commissioner that, "Nothing has come to my attention that would indicate operating results materially more favorable for May, 1980 than those experienced in April, 1980." Seeley Affid., ¶ 3 (8–26–80).

In early May, Strasser finally came up with a buyer for the Association. Strasser obtained a written commitment from The Heron Corporation to purchase 80 per cent of Telegraph's preferred stock for $7 million. The deal was conditioned, however, on FSLIC's promise to provide Telegraph with a 15-year, $15 million interest-free loan, to be extended for an additional five years at six per cent interest. This proposal was evaluated by the FHLBB at a closed meeting on May 22 and rejected for two

---

[1]. Telegraph's monthly losses and declining net worth from July 1979 through April 1980 were as follows:

| Date | Income or Loss for Month | Net Worth |
|------|------|------|
| 7/01/79 | | 4,806,938 |
| 7/31/79 | (435,915) | 4,371,023 |
| 8/31/79 | (366,695) | 4,004,328 |
| 9/30/79 | (291,348) | 3,712,980 |
| 10/31/79 | (315,479) | 3,397,501 |
| 11/30/79 | (345,726) | 3,051,775 |
| 12/31/79 | (255,843) | 2,780,283 |
| 1/31/80 | (561,442) | 2,218,841 |
| 2/29/80 | (455,074) | 1,763,767 |
| 3/31/80 | (579,454) | 1,184,313 |
| 4/30/80 | (734,924) | 449,389 |

Conover Affid., ¶ 1–13 (8–26–80).

reasons: First, it was thought to provide insufficient capital to turn the Association around and second, it appeared that a sale of the assets would prove more costly to the FSLIC than other alternatives under consideration.[2] Compilation of Materials Filed by FHLBB in Support of Motion for Summary Judgment, "Certified Transcript," pp. 6, 16, 22–26. At this meeting, it was also decided that when the State Commissioner took custody of Telegraph, the FHLBB would, pursuant to its statutory authority,[3] appoint FSLIC receiver and immediately transfer the assets and liabilities to First Federal Savings & Loan Association under a purchase and assumption agreement. *Id.*

Later in the day, without giving prior notice, the Commissioner took custody of Telegraph.[4] The Commissioner's custody notice stated that Telegraph's withdrawal capital and permanent capital reserve were impaired; that it was unable to continue operations; and that its financial condition constituted an emergency, thereby excusing the Commissioner from giving Telegraph prior notice and an opportunity for corrective action.[5] Complaint, Ex. A. Moments later, the FHLBB's order appointing FSLIC receiver went into effect. The order stated the following grounds for the receivership:

Telegraph is in an unsafe and unsound condition to transact business in that the association's losses have placed Telegraph in a condition of insolvency or imminent insolvency;

Complaint, Ex. B. The final act of the drama took place later that evening, when the FSLIC, as receiver, executed the purchase and assumption agreement with First Federal Savings & Loan Association. By the end of May 22, 1980, Telegraph had ceased to exist.

## II. DISCUSSION

On June 3, 1980, the Association filed a ten-count complaint against a number of parties, including the Illinois Commissioner, the FHLBB and the FSLIC. Count III, attacking the legality of the receivership, is the keystone of the complaint, as a brief survey of the federal statutory framework demonstrates.

Title 12 U.S.C. § 1464(d) and § 1729 contain the provisions governing the appointment of federal receivers for state savings and loan associations and challenges to such appointments. With respect to challenges to a receivership, § 1464(d)(6)(A) provides that

In the event of such appointment [of a receiver], the association may, within

2. Joseph Arendes, a FHLBB staff member, submitted a written recommendation to the Board urging that the Heron proposal be accepted. Arendes has since stated that the memo was "anticipatory ... [and] solely my conjecture which neither then nor later had any basis in fact." Arendes Affid., ¶ 4. Plaintiff has offered expert testimony to the effect that the proposal was sound and would have turned Telegraph into a profitable operation. Shapiro Affid., (4–9–81). The Board found, however, that the cost to the FSLIC to the Heron proposal was $3 million greater than the cost of transferring the business to another savings and loan institution under a purchase and assumption agreement. Compilation of Materials Filed by FHLBB in Support of Motion for Summary Judgment, "Certified Transcript" at 6.

3. Title 12 U.S.C. § 1729(c)(2).

4. The Commissioner took custody of Telegraph pursuant to Ill.Rev.Stats. ch. 32, § 848 which provides that

The Commissioner in his discretion may take custody ... if it appears from reports made to the Commissioner, or from examination made by or on behalf of the Commissioner: ... (b) That the withdrawable capital of the association is impaired to the extent that the realizable value of its assets is insufficient to pay in full its creditors and holders of its withdrawable capital; or that its permanent reserve capital is impaired; or (c) That the association is unable to continue operation; ...."

5. Ill.Rev.Stats. ch. 32, § 848, provides that "[u]nless the Commissioner finds that an emergency exists which may result in loss to members or creditors and requires that he take custody immediately, he first shall give written notice to the directors, trustees, or liquidators specifying the conditions criticized and state a reasonable time within which correction may be made."

thirty days thereafter bring an action in the United States district court for the judicial district in which the home office of such association is located ... for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver.

Suit under § 1464(d)(6)(A) is the only means of attacking the legality of the conduct of a receivership, as § 1464(d)(6)(C) makes clear:

Except as otherwise provided in this subsection, no court may take any action for or toward the removal of any conservator or receiver, or, except at the instance of the Board, restrain or affect the exercise of power or functions of a conservator or receiver.

Plaintiffs argue that if the court finds that the receiver was unlawfully appointed, a full panoply of equitable relief should be available to set aside the sale of assets.[6] Nonetheless, the parties do agree that if plaintiff does not prevail under § 1464(d)(6)(A), all other causes of action challenging the appointment and conduct of the receiver must be dismissed.

We turn then to the law governing the appointment of receivers under Title 12. Section 1729(c)(2) provides the FHLBB with "exclusive power and jurisdiction" to appoint the FSLIC receiver for the assets of an insured state savings and loan association in the event the Board determines:

(A) that ... (ii) an insured institution (other than a Federal savings and loan association) has been closed by or under the laws of any State; .

(B) that one or more of the grounds specified in paragraph (6)(A) of section 1464(d) of this title, existed with respect to such institution at the time a conservator, receiver, or other legal custodian was appointed, or at the time such institution was closed ...; and

(C) that one or more of the holders of withdrawable accounts in such institutions is unable to obtain a withdrawal of his account, in whole or in part;

Section 1464(d)(6)(A), referred to in subsection (B) of the foregoing statute, provides that

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following:

(i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members;

&ast; &ast; &ast; &ast; &ast; &ast;

(iii) an unsafe or unsound condition to transact business;

&ast; &ast; &ast; &ast; &ast; &ast;

The Board shall have exclusive power and jurisdiction to appoint a conservator or receiver. If, in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver of the association.

The legality of the receivership turns on whether these three requirements set forth in § 1729 existed at the time of the appointment.

Before we apply this law to the facts of the case, however, it is necessary to establish the proper role of this court in reviewing the appointment of federal receivers for savings and loan institutions. As discussed above, § 1464(d)(6)(A) allows an association to challenge a receivership within 30 days after the appointment. The statute instructs that "the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver."

The parties differ as to the court's role in this rather arcane proceeding prescribed by the statute. Defendants argue that the statute authorizes a limited review in which "the court must defer to the regulators on matters of policy and judgment, ... determining [only] whether the basic prerequisites for administrative action have been

---

**6.** Plaintiff seeks this equitable relief in Counts IV, VI, VII, IX and X.

satisfied." Def.'s Memo. In Support of Summary Judgment, 14. Plaintiff contends that the language "on the merits" requires the court to conduct a *post facto* adversarial hearing in which the "reasonableness" of the government's action is independently evaluated. Summary of Pl.'s Response to Def.'s Summary Judgment Motion, 3.

We agree with plaintiff that it is entitled to a full adversarial hearing "on the merits" of the case. This conclusion is compelled by the structure of the statute, by the legislative history and by the strictures of due process. We begin with the statute itself. Section 1464(d)(6)(A) entitles the FHLBB to seize control, *ex parte,* of a savings and loan association if, in its opinion, seizure is warranted. The Board is required neither to make findings nor to give reasons for its action. Rather, the first hearing accorded an association is in the district court and it is at this hearing that Congress apparently intended that such findings and reasons would emerge. That the hearing is to be "on the merits" suggests that the plaintiff is entitled to a more expansive review than that mandated by statutes requiring hearings "on the record." 5 U.S.C. § 706(2)(E) (review "on the record" authorizes court only to determine whether the decision is "unsupported by substantial evidence."); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1970). In defining our proceeding as one "on the merits," rather than one "on the record," the statute seems to require not an appellate-type proceeding but rather an exercise of this court's *de novo* jurisdiction. *See Stoner v. Presbyterian University Hospital,* 609 F.2d 109, 112 (3rd Cir.1979). Finally, that the agency action is to be tested in an expedited hearing evidences Congressional recognition of the significance of the due process interests involved in an ex parte seizure of property. In view of the significance of these interests, it would be anomalous to conclude that Congress intended to confine the court to a limited review of the seizure.

The legislative history of § 1464(d)(6)(A) reinforces this conclusion. Prior to 1966, the FHLBB could not appoint a receiver without first conducting a hearing at which the subject association had the opportunity to introduce evidence and cross examine.[7] In 1966, Congress gave the Board the power to appoint a receiver *ex parte* and without notice. In so doing, however, Congress substituted for the prior hearing an expedited hearing to be held in federal district court after the receiver had taken custody. Defendants have introduced no evidence from the legislative history—nor have we found any—which indicates that Congress intended to deprive an association of the right to contest the receivership in at least one full adversary hearing.

Moreover, providing an association with anything less than an adversarial hearing in the wake of an *ex parte* seizure offends the principles of due process. "Temporary governmental action against a particular party may often be taken without prior hearing if opportunity for full hearing is provided within a reasonable time." 2 Davis, *Administrative Law Treatise* 388 (2d ed. 1979); *see, e.g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908); *Lawton v. Steele,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1969). The question presented to the court in the instant case raises important due process interests which can be resolved only through a detailed exploration of factual matters, viz., whether Telegraph was insolvent or in an unsafe and unsound condition at the time it was committed to a receiver.

While we therefore find that plaintiff is entitled to a *de novo* hearing "on the mer-

---

**7.** The legislative history appears in S.Rep. No. 1263, 90th Cong., 2d Sess. *reprinted in* 1968 U.S.Code & Ad.News 2530.

its,"[8] we also agree with defendants that the "merits" are limited to the issue of whether the Board had statutory authority to appoint the FSLIC receiver. We are concerned in this proceeding not with the reasonableness or wisdom of the Board's conduct, but only with the question of whether the requirements of § 1729(c)(2) existed at the time Telegraph passed into receivership. Whether the Board should be able to take such action once those requirements have been met is one of those "fundamental policy questions appropriately resolved by Congress ... [which] are not subject to re-examination in the federal courts under the guise of judicial review of agency action." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1977); *see also Radio Corporation of America v. U.S.,* 341 U.S. 412, 415, 71 S.Ct. 806, 807, 95 L.Ed. 1062 (1951) ("courts should not overrule an administrative decision merely because they disagree with its wisdom").

Two procedural questions remain before we reach the merits. The statute is silent as to which party shall bear the burden of proof in a suit challenging the agency's *ex parte* seizure and by what quantum of evidence that proof shall be established. On this point, plaintiff argues that the FHLBB has the burden of showing that its decision was reasonable in light of the facts. Summary of Pltf.'s Response to Def.'s Summary Judgment Motion, 10–11. We disagree. The general rule regarding burden of proof in actions challenging agency action is that the burden of proving error is on the party contesting the validity of the action. *Pacific States Co. v. White,* 296 U.S. 176, 56 S.Ct. 159, 82 L.Ed. 138 (1935). Where the agency action pursuant to a notice and hearing procedure, the presumption of validity is especially warranted. *Id.* at 185, 56 S.Ct. at 163. Nonetheless, even where the agency acted *ex parte,* its decision is still entitled to a presumption of correctness, albeit a lesser one. *New Hampshire Fire Insurance Co. v. Murray,* 105 F.2d 212, 217–218 (7th Cir.1939). The presumption accorded *ex parte* action is one of "prima facie correctness"); *but see U.S. v. Maxwell,* 278 F.2d 206 (8th Cir.1960). This view is confirmed by the more recent case of *Citizens to Preserve Overton Park v. Volpe, supra.* In that case, the government agency acted without a hearing and without stating findings; the Court held that while the agency's action was subject to a "probing in depth review," nevertheless, "the Secretary's decision is entitled to a presumption of regularity." 401 U.S. at 415–416, 91 S.Ct. at 823.

The burden is thus on the challenger, Telegraph, to overcome that presumption.[9] But because the presumption is only slightly in favor of the FHLBB, plaintiff need not go so far as to show the agency's decision was arbitrary or capricious; plaintiff need only show that the decision was incorrect by the greater weight of the evidence. This conclusion is supported by the provisions in the Administrative Procedure Act, 5 U.S.C. § 706(2)(F) relating to *de novo* trials. Section 706(2)(F) provides that a reviewing court shall

---

**8.** We wish to emphasize that our finding that a *de novo* hearing is required is based not on any provision of the Administrative Procedure Act, 5 U.S.C. § 706, but on the provisions of 12 U.S.C. § 1464(d)(6)(A). The Supreme Court has stated that the APA authorizes a de novo review only "... when the action is adjudicatory in nature and the agency factfinding procedures are inadequate. And there may be independent judicial factfinding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1970). Since we rely on § 1464(d)(6)(A) for the requirement of *de novo*

review, we need not determine whether such review would also be allowed under 5 U.S.C. § 706.

**9.** A different result would obtain if this action were brought by the agency to enforce its own ruling. In such a case, the agency acts in the role of prosecutor and is given the prosecutor's burden. *U.S. v. International Harvester Co.,* 387 F.Supp. 1338 (D.C.D.C.1974). Section 1464(d) provides a different scheme. Under the statute, agency action is not tested through an enforcement proceeding but through suit instituted by the association.

(2) hold unlawful and set aside agency action findings, and conclusions found to be—

 \* \* \* \* \* \*

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

Although our proceedings in this case are not governed by the provisions of 5 U.S.C. § 706(2)(F), but by 12 U.S.C. § 1464(d)(6)(A), see *Forester v. Consumer Products Safety Commission*, 559 F.2d 774 n. 22 (D.C.Cir.1977), the comparison is instructive. In other contexts in which a trial *de novo* is considered appropriate, the Congressional preference is for a decision based on whether the agency action is supported by the facts.

Lastly, we note that the statute as it existed prior to 1966 provided that the Board's determination that a receivership was justified should be "subject to review ... by the court ... upon the weight of the evidence."[10] It does not appear to us that in revising this statute, Congress intended to impose a heavier burden of proof on an association than existed under the old statute.

We now turn to the merits and consider whether, on the weight of the evidence, the three prerequisites for the appointment of a receiver existed.

It must first be determined whether "an insured institution ... has been closed by or under the laws of any state." Plaintiff argues that this condition was not met here since although Telegraph was closed by state officials, it was not closed in compliance with state law. According to Illinois law, unless an emergency exists, the state must give notice to the savings and loan association prior to taking custody of its business. Ill.Rev.Stat. ch. 32, § 848. In closing Telegraph, the Commissioner claimed that an emergency existed and gave no notice. Plaintiff disputes the existence of an emergency and contends that since notice was not given, the institution was not closed "by or under the laws of" Illinois.

The legislative history of § 1729 leads us to a different conclusion.[11] Prior to the Bank Protection Act of 1968, which enacted § 1729(c)(2), when a state took custody of a federally insured state savings and loan association, the state was free to appoint its own receiver or to delegate the task to the FSLIC. Although the FSLIC usually absorbed upwards of 95 per cent of a failing association's liabilities, it was seldom appointed receiver. Between 1941 and 1968, only five associations in the nation went into receivership. The FSLIC, while primarily liable on the claims against these institutions, was given control over none of the assets. In one case involving the failure of Marshall Savings & Loan Association, the state receiver accepted FSLIC insurance money but refused to provide the corporation with any financial records. When the records were provided several years later, it became apparent that Marshall's assets had been allowed to deteriorate. The Senate Report on the Bank Protection Act described the problem:

> Thus, under the information blackout, the Marshall receivership tied up $83 million of the FSLIC's capital for 3 years at an interest cost of $12 million; it increased the insolvency of the association by more than $4 million; and it failed to pay back a single penny to the FSLIC for its insurance payments or for interest on its capital. Unfortunately, under existing law, except for its claim for interest in the use of its funds, the Home Loan Bank Board and the FSLIC were completely powerless to deal with the situation. Unlike Federal associations, the Home Loan Bank Board could not appoint the FSLIC as receiver to safeguard the association's assets and to effect an orderly liquidation.

S.Rep. No. 1263, 90th Cong., 2d Sess. *reprinted in* 1968 U.S.Code Cong. & Ad.News 2530, 2537. Legislation allowing the

---

**10.** *See* former 12 U.S.C. § 1464(d)(2); *see, e.g., Beacon Federal Savings & Loan Association v. FHLBB,* 162 F.Supp. 350 (E.D.Wis.1958).

**11.** See note 7.

FHLBB to appoint the FSLIC as receiver whenever a state takes custody of an insured institution was finally introduced when two other Illinois receiverships threatened to repeat the Marshall situation. *Id.* at 2537.

■ Section 1729(c)(2) was thus intended to protect the funds of the FSLIC from dissipation in the hands of a state receiver. In view of this purpose, the legality of the receivership under state law is hardly relevant to FSLIC's authority to take charge of the assets of a defunct association. Whenever a state savings and loan association is closed, FSLIC's funds are put at risk. The FSLIC would be in no better position if its funds were depleted by a receiver who took possession in accordance with, rather than in violation of, state law.

The legislative history reveals another reason why plaintiffs' argument cannot be accepted. The Senate Report notes that "the effect of the legislation would be to enable the FSLIC to defend its appointment under Federal law instead of requiring it to defend the legality of the State savings and loan administrator's determinations under state law." *Id.* at 2540. To require the FHLBB to show that Telegraph was taken into custody in compliance with Illinois law would undermine the Congressional intent to have the federal agencies'

conduct evaluated under uniform federal law.

We therefore conclude that the first requirement of § 1729(c) is met whenever an institution is closed by state officials.[12] Since it is undisputed that Telegraph was closed by state officials on May 22, 1980, the first requirement of § 1729(c)(2) was satisfied.

■ The second requirement is that one or more grounds specified in § 1464(d)(6)(A) exist at the time the association passes into receivership. Defendants argue that at the time the FSLIC took over, Telegraph was both insolvent and in an unsafe and unsound condition to transact business.[13] We turn first to evidence of Telegraph's insolvency as of May 22, 1980. It is undisputed that from July 1, 1979, to April 30, 1980, Telegraph's net worth steadily declined from nearly $5 million to $450,-000.00 and that the operational losses for April alone exceeded $734,000.00. On May 19, Telegraph's comptroller made the following projection:

> Based upon my review of the books and records of Telegraph as of May 19, 1980 and taking into consideration my knowledge of the financial circumstances of Telegraph, I estimated that for the period

**12.** We think the intent of the language "by or under the laws of any state" is similar to that of the phrase "under color of" state law which appears in 42 U.S.C. § 1983. The Supreme Court has interpreted the latter phrase to include not only action performed in conformity with state law but also action "made possible only because the wrongdoer is clothed with the authority of state law." *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1960).

**13.** The Board cited the following reasons for its appointment of FSLIC as receiver:

> Telegraph is in an unsafe and unsound condition to transact business in that the association's losses have placed Telegraph in a condition of insolvency or immanent insolvency. Complaint, Ex. B. Plaintiff contends that in view of this statement, the Board moved against Telegraph only under the "unsafe and unsound" provision of § 1464(d)(6)(A). Since an agency's action can only be upheld on the basis that was articulated by the agency itself,

and not on the basis of post-hoc rationalizations, *S.E.C. v. Chenery Corporation,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), plaintiff objects to the Board's attempt to justify its conduct under both the "unsafe and unsound" provision and the "insolvency" provision of § 1464. We think, however, that the Board's statement expressed its intent to proceed against Telegraph under both provisions of the statute. Moreover, the rule prohibiting *post hoc* rationalizations is intended to "avoid propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency." *Id.* at 196, 67 S.Ct. at 1577. In the instant case, evaluation of the Board's decision under the "insolvency" provision of § 1464(d)(6)(A) will not constitute an invasion of the FHLBB's turf. In justifying the receivership, the agency expressly stated that insolvency was Telegraph's central problem. That the wording of the Board's statement did not systematically reflect the categories set forth in the statute does not obscure the substance of the Board's findings.

of May 1 through 19, 1980, Telegraph had lost $591,778.29 and I projected that for the entire month of May, Telegraph would lose $983,147.86.

Conover Affid., ¶ 3 (8–26–80). On the basis of the comptroller's projections, Telegraph had a negative net worth of approximately $142,000.00 on May 19 and of approximately $240,000.00 on May 22. Based on April's losses, Telegraph's treasurer also estimated that the Association had a negative net worth of $89,000.00 as of May 22, 1980. Seeley Affid., ¶ 5 (8–26–80).

Plaintiff challenges these figures as speculative. Telegraph points out that it kept its books on an accrual basis and that under this system, its net worth could not have been calculated until the end of the month and would not have been available until the Association filed its report with the FHLBB on June 10, 1980. Plaintiff's expert Dr. Sherman Shapiro concludes that "any intra-monthly calculation or quantification of Telegraph's net worth such as was attempted on May 22, 1980, would be extremely tentative and subject to wide variances." Shapiro Affid., ¶ 33 (4–10–81). Shapiro even questions the accuracy of the net worth figures appearing in the monthly reports. He states that, "The first truly accurate calculation of Telegraph's net worth would not have been available until the annual audit as of June 30, 1980, in view of the necessary adjustments, frequently substantial, that are customarily made in connection with such audits." Id. at ¶ 34.

While we understand Dr. Shapiro's concern for obtaining the most accurate assessment of Telegraph's position, we do not believe that Congress intended that the FHLBB await the issuance of a failing association's annual audit (which may be months away) or even the issuance of its monthly statement (which may be weeks away) before appointing a receiver under § 1464(d)(6)(A)(i). The insolvency requirement must be read in light of the purpose of the Bank Protection Act of 1968 to safeguard the financial integrity of the FSLIC. That purpose would be seriously undermined if § 1464(d)(6)(A)(i) were read to re-quire the FHLBB to wait weeks or months—while the association's liabilities, and, thereby, the FSLIC's obligations, increase—before exercising its statutory authority to take custody of a business which is projected to have a substantial and growing negative net worth.

In our view, plaintiff's argument goes too far. Its position is that projections of net worth are per se an unreasonable basis for the Board's exercise of its power. As the foregoing discussion indicates, we think the Board is entitled to rely on projections of net worth, provided they are reasonable. There is a strong argument that the net worth estimates upon which the Board relied here were reasonable. The projections were entirely in keeping with the Association's performance for the month of April and for the prior ten months. Moreover, according to Telegraph's treasurer, there were no indications that May would show improved performance. Seeley Affid., ¶ 4 (8–26–80). Additionally, the projections were made by apparently reliable sources of information concerning Telegraph's financial status, namely its treasurer and its comptroller. Plaintiff contends that notwithstanding these indices of reliability, "there was no reasonable basis upon which a finding of insolvency or imminent insolvency could have been made." Shapiro Affid., ¶ 31 (4–9–81).

While at first blush the projections appear to have been reasonable, Dr. Shapiro's affidavit has put this factual issue squarely in dispute. Therefore, it can only be resolved at trial.

As noted above, the Board also exercised its powers of appointment on the ground that Telegraph was in an "unsafe and unsound condition to transact business." In the court's view, deciding whether Telegraph was in an unsafe and unsound condition is considerably more complex than deciding whether the institution was insolvent. For this reason, we will defer consideration of the "unsafe and unsound" issue pending our decision on the insolvency issue.

The final requirement under § 1729(c)(2) is that "one or more of the holders of withdrawable accounts in such institution is unable to obtain a withdrawal of his account in whole or in part." In the instant case, the FHLBB sought to satisfy this requirement in the following manner. Immediately after the state officials closed the Association, the Board requested one of its employees, who was a depositor at Telegraph, to attempt to withdraw $25.00. Since the bank had been closed, the demand was refused. The "disgruntled" depositor was, on the spot, presented with an affidavit memorializing the bank's refusal, which he signed. Plaintiff argues that the third requirement of § 1729(c) was intended to limit FSLIC receiverships to those cases in which an association does not in fact have sufficient liquidity to meet depositors' demands. At the time the $25.00 demand was made, Telegraph had over $11 million in liquidity. Shapiro Affid. ¶ 9 (4–9–81). Plaintiff contends that by seeking to satisfy the requirement through a bit of play acting, the Board renders it meaningless. The Board responds that once an association is closed under state law, depositors *ipso facto* cannot withdraw their funds. The language of the statute, they say, makes no distinction between situations in which demands are made by lines of panicked depositors and those in which a demand is made by a person acting at the behest of the Board.[14]

While the playlet directed by the Board in this case borders on the farcical, the fault is not with the director but with the script, i.e., the statute. Section 1729(c)(2) proposes three *conjunctive* requirements for the appointment of the FSLIC as receiver. A cursory examination of these requirements reveals that the third requirement (that a depositor be unable to withdraw funds) cannot be given meaning independent of the first (that the association be closed under state law): Once an association is closed, no depositor can get his money. We are aware of the canon of statutory construction which provides that a statute should be construed so as to give effect to all its parts. *General Motors Acceptance Corp. v. Whisnant*, 387 F.2d 774 (5th Cir.1968). But with respect to § 1729(c)(2), plaintiffs have shown us no way in which we could interpret the third requirement to give it independent meaning. Plaintiff only states that it should be construed to apply exclusively to the case in which an association is subject to a genuine run on its deposits. Plaintiffs fail to realize that such a run is impossible after an association has already closed its doors.

We therefore find that the third requirement was met after Telegraph was closed and a demand was refused.

## SUMMARY

With respect to Count III, we find a genuine issue of material fact on one issue only: the reasonableness of the net worth projections upon which the Board relied in appointing the FSLIC receiver. A trial will be held on this issue. Should plaintiff fail to show by the greater weight of the evidence that the projections were not reasonable, judgment on Count III will be entered in favor of defendants. If, however, the court finds that the projections were unreasonable, it will consider in further proceedings whether any other conditions listed in 12 U.S.C. § 1464(d)(6)(A) existed at the time Telegraph was closed.

The parties are requested to appear at 9:45 a.m. on June 16, 1981, for the purpose of setting a trial date.

## ON MOTION FOR MODIFICATION

Before the court is the motion of Telegraph Savings & Loan Association ("Tele-

---

14. The Board also justifies the use of its own agent to satisfy the third requirement of the statute by the desire to prevent panic among the depositors. The Board points out that plaintiff's argument that an institution may be closed only when it genuinely does not have sufficient cash on hand to pay depositors suggests that conditions conducive to panic must exist before the Board is empowered to act. However, in view of the purpose of § 1464 and § 1729 to preserve public confidence, Sen. Report No. 1263, *supra* at 2536, it would be odd indeed if the Board were required to stay its hand until the crowds were at the association's doors.

graph" or "the Association") for modification and clarification of our Memorandum Opinion of June 9, 1981. Telegraph raises four issues. First, it argues that although we granted it a trial *de novo* on whether the criteria of 12 U.S.C. § 1729(c)(2) have been met, we have unduly limited the scope of that trial. Second, Telegraph contends that it must be allowed to litigate the merits of the Heron Proposal which the Federal Home Loan Bank Board ("FHLBB" or "the Board") rejected in preference to the purchase and assumption agreement it entered into with First Federal Savings & Loan Association. Third, the Association asserts that we erred in failing to examine its challenge to the sale of the Association's assets. Finally, Telegraph seeks modification of our ruling that the legality of the state's custody proceedings does not affect the legality of the federal receivership.

## I. Scope of the Trial De Novo

In our opinion of June 9, 1981, we pointed out that under 12 U.S.C. § 1729(c)(2), the FHLBB may appoint the Federal Savings & Loan Insurance Corporation ("FSLIC") receiver of a state savings and loan association only if three criteria are met. We stated our role in the trial *de novo* as follows:

> We are concerned in this proceeding not with the reasonableness or wisdom of the Board's conduct, but only with the question of whether the requirements of § 1729(c)(2) existed at the time Telegraph passed into receivership.

Mem.Op., 9.

In its motion to reconsider, Telegraph argues that this scope of review of the agency's action is too narrow. It argues, as it did in earlier briefs, that the trial should not be confined to a "bare bones analysis of whether the statutory grounds were present," but should go on to consider whether the Board's decision, even though authorized by statute, was a reasonable one.

Plaintiff has given us no convincing reasons why we should change our ruling. Telegraph argues that the decision to place it in receivership was made *ex parte*, with-

out notice, without representation, and without an opportunity to present evidence and cross examine witnesses. In our opinion, we recognized the constitutional ramifications of the Board's *ex parte* proceeding and we accordingly ruled that Telegraph must be accorded a full opportunity to present evidence and cross examine witnesses on the issue of whether the Board's conduct met the statutory requirements. Neither the statute nor due process requires the court to go beyond this. The statute provides that the Board is entitled to appoint a receiver if "in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists . . . ." 12 U.S.C. § 1464(d)(6)(A). At the behest of the subject association, a district court is empowered to review the "merits" of the Board's decision. We read the word "merits" to refer to the issue of whether "a ground for the appointment of a conservator or receiver as herein provided exists." And we read the term "ground as herein provided" to refer only to the statutory grounds set forth in § 1464(d)(6)(A) and in § 1729(c)(2). We fail to see how the statute can be read any other way.

 We also noted in our opinion that once the statutory grounds are shown to have been met, the court's labors come to an end. The wisdom of the Board's decision to exercise its power of receivership is an issue that Congress has vested in the Board and that is "not subject to re-examination in the federal courts under the guise of judicial review of agency action." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1977). Telegraph takes issue with our reliance on *Vermont Yankee* since in that case the parties were given notice and a hearing before the agency. Nonetheless, we think the view expressed in the portions we have quoted from the *Vermont Yankee* case is apposite to the instant case. In *Vermont Yankee*, the Supreme Court cautioned against judicial intervention, absent statutory authorization, in policy matters which Congress had itself resolved or com-

mitted to an agency for resolution. *See* 435 U.S. at 519, 98 S.Ct. at 1197. The Court's remarks do not hinge on the amount of process an aggrieved party has received before an agency. Rather the remarks concern the allocation of responsibility for policy decisions between the judicial and legislative branches. Our authority extends to a determination of whether the agency's action was authorized by statute; determination of the reasonableness of the action is not our responsibility.[1]

 Telegraph also requests us to reconsider our decision to limit the hearing, at least initially, to the single issue of whether the Association was insolvent at the time it went into receivership. As we stated in our opinion, the Board cited two reasons under § 1464(d)(6)(A) for its action, namely, that the Association was insolvent and that it was in an unsafe and unsound condition to transact business. Telegraph argues that it should be entitled "to contest . . . all of the bases and possible bases upon which the Board acted, as evidenced by the transcript of the Board's own proceedings." Pltf's. Mem., 6. In support of its position, the Association cites *Jordan v. American Eagle Fire Insurance,* 169 F.2d 281 (D.C.Cir. 1948). In that case, American Eagle sought to enjoin enforcement of an order of the Superintendent of Insurance which adjusted insurance rates. The Superintendent acted pursuant to a statute which provided that "[i]n determining the necessity for an adjustment of rates, the Superintendent shall give consideration to all factors reasonably attributable to the risks, to the conflagration or catastrophe hazard, both within and without the District and to a reasonable profit." 169 F.2d at 283. The statute further provided that any aggrieved person may "contest the validity of such order" of the Superintendent. In construing the phrase "contest the validity," the court held that the phrase meant "to test validity in any or every respect in which the order might be invalid." *Id.* at 289. From this case, plaintiff draws the conclusion that it is entitled to test all the possible bases for the Board's decision. However, *Jordan* does not compel such a result. The holding in that case must be read in light of the statute under which the agency acted. That statute instructed the Superintendent to give consideration to *all* factors relevant to the adjustment of insurance rates. Reliance by the Superintendent on one inapposite factor could affect the entire calculation. It is hardly surprising that under such a statute, an aggrieved party is entitled to explore all aspects of the Superintendent's order. Our statute is of a different nature. Section 1464(d)(6)(A) provides that "[t]he grounds for the appointment of a conservator or receiver for an association

---

1. Our reading of § 1464(d)(6)(A) is strongly supported by a decision of the Supreme Court involving a closely analogous statute. In *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412 (1975), the Court was called upon to determine whether the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.,* created a private right of action. In reviewing the structure of the statute, the Court pointed out that if the SIPC determines that a member-investment house is failing, the SIPC may apply to a court "for a decree adjudicating that customers of such member are in need of the protection provided by the Act." § 78eee(a)(2). The statute further provides that "[U]pon receipt of an application by SIPC . . . the court shall forthwith issue a protective decree if the debtor consents thereto, if the debtor fails to contest such application, or if the court finds that such debtor—" meets any of four conditions, one of which is insolvency. As in § 1464(d)(6)(A), the conditions are listed in the disjunctive. The Supreme Court interpreted the SIPA receivership provisions in the following manner: "If the court finds any of the five conditions on which an SIPC application may be based, it must grant the application and issue the decree, and appoint as trustee for the liquidation of the business and as attorney for the trustee, 'such persons as SIPC shall specify.' " *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, at 416–417, 95 S.Ct. 1733 at 1736–37, 44 L.Ed.2d 263. The Court's language fully supports our holding that we are not empowered to look beyond the existence of the statutory conditions to determine whether the receivership was "reasonable." As the Court stated in *Barbour,* if one of the conditions is met, the court "must grant the application and issue the decree." We see no difference between the procedure prescribed by § 78eee and that prescribed by § 1464(d)(6)(A); nor do we see any reason to treat cases brought under § 1464(d)(6)(A) any differently from that brought under § 78eee.

shall be *one or more* of the following ....
If in the opinion of the Board, a ground for
the appointment of a conservator or receiv-
er as herein provided exists, the Board is
authorized to appoint" such receiver. Since
it is sufficient to continue a receivership if
one ground for the appointment of a receiv-
er is found to exist, unlike *Jordan,* we need
not consider all of the bases upon which the
agency acted.[2]

This is not to say, however, that the
Board may justify its action on the basis of
*post hoc* rationalizations. "While we may
not supply a reasoned basis for the agency's
action that the agency itself has not given,
... we will uphold a decision of less than
ideal clarity if the agency's path may rea-
sonably be discerned." *Bowman Transpor-
tation, Inc. v. Arkansas-Best Freight Sys-
tem, Inc.,* 419 U.S. 281, 285–286, 95 S.Ct.
438, 441–442, 42 L.Ed.2d 447 (1974). Tele-
graph continues to argue, however, that the
Board did not act on the ground that the
Association was insolvent but only on the
ground that it was unsafe and unsound.
On this motion, Telegraph adds that our
finding that the Board acted on both
grounds was not in keeping with the princi-
ples of summary adjudication. The Associ-
ation argues that, viewed in light most fa-
vorable to the opponent of the summary
judgment motion, i.e., Telegraph, the record
reveals a genuine issue of fact as to wheth-
er the Board acted on the basis of Tele-
graph's insolvency. We disagree. Tele-
graph does not dispute the fact that the
Board's notice accompanying its appoint-
ment of the FSLIC as receiver stated that
"... the Association's losses have placed
Telegraph in a condition of insolvency or
imminent insolvency." Nor does the Asso-
ciation dispute the fact that the transcript
of the Board's closed meeting on May 22,

1980, at which the decision to appoint a
receiver was made reveals that the Associa-
tion's insolvency was the first matter dis-
cussed by the Board. Telegraph points out
that discussion of the insolvency issue com-
prised less than five pages of a 30-page
transcript, the balance of which records the
discussion of what to do with the failing
association. But we do not see how the
amount of time the Board devoted to the
insolvency issue controverts the fact, as re-
vealed by the transcript, that the Board
was concerned with the Association's net
worth. At page 2 of the transcript, the
Board discussed the Association's operating
losses between July 1, 1979, and April 30,
1980, its losses projected through June 30,
1980, and its net worth as of April 30, 1980.
On page 3, it examined Telegraph's month-
ly operating losses, the statement of Tele-
graph's comptroller that things would not
improve and Telegraph's position with re-
spect to the current cost of borrowing mon-
ey. On page 4, the Board noted that its
assessment of the Association's net worth
position was in agreement with that of the
Illinois Commissioner, that the Board's in-
formation was accurate and that the Illinois
Commissioner intended to take custody of
the institution on the grounds that it was
insolvent. Starting with these undisputed
facts, we have no trouble discerning the
path the Board took in reaching its decision
to place the institution in receivership. In
view of the Board's rather thorough explo-
ration of Telegraph's net worth and in view
of the Board's statement of reasons for the
receivership, the mere fact that the Board
devoted a small portion of its meeting to
the insolvency issue does not put in contro-
versy the issue of whether the Board closed
the Association on insolvency grounds.[3]

**2.** The language we cited from *Securities Inves-
tor Protection Corp. v. Barbour,* in note "1"
also supports our ruling that we need only
ascertain the existence of one statutory condi-
tion to continue the receivership. As the Court
stated in *Barbour,* "If the court finds *any of the
five conditions* on which an SIPC application
may be based, it must grant the application and
issue the decree ...." 421 U.S. at 416–417, 95
S.Ct. at 1736–1737. (Emphasis supplied) By
analogy, we conclude that the FHLBB need

only prove the existence of "any one of the ...
conditions" listed in § 1464(d)(6)(A) to with-
stand a challenge to its receivership.

**3.** Plaintiffs also contend that this court may not
grant summary judgment on any issue involv-
ing the Board's closed meeting of May 22, 1980,
since defendants have withheld from discovery
seven pages of the transcript of that meeting.
Pursuant to an order of this court, the Board
produced the seven pages for *in camera* review.

■ As we have stressed, under the statute the insolvency grounds is a sufficient ground in and of itself for the appointment of a receiver. Plaintiff has presented no facts which controvert the proposition that the Board relied on the insolvency ground in appointment of a receiver. That the Board may have simultaneously relied on other grounds, e.g., that the Association was unsafe and unsound, even in view of the Heron proposal, does not detract from our decision that the Board's action may be tested and validated on the insolvency ground alone. The reason for doing so, of course, is that protracted litigation on the more complicated "unsafe and unsound" issue will be unnecessary in the event defendants prevail on the insolvency issue.

## II. The Heron Proposal

■ Telegraph also seeks modification of our ruling that the Heron proposal would not be considered at trial. We stated that we would initially confine the trial to the issue of whether the Board could reasonably have found that Telegraph was insolvent at the time it passed into receivership. We also stated that if we found that the Board's action could not be justified on the insolvency ground, we would then consider in later proceedings whether it could be justified on the unsafe and unsound ground. The Heron Proposal submitted by the Association called for the purchase of a large percentage of Telegraph's stock by an outside buyer. While it is conceivable that the proposal has some bearing on the issue of whether Telegraph was in an unsafe and unsound condition to transact business, as a *prospective* measure intended to boost the

Association's net worth, the proposal is irrelevant to the issue of whether the Association was insolvent at the time it passed into receivership. For this reason, we defer consideration of the Heron proposal pending the outcome of the trial on the insolvency issue.

## III. Sale of the Assets

■ Telegraph also objects that our opinion did not discuss the constitutionality of the sale of the Association's assets. If we find that the appointment of the receiver was improper, we will not need to reach the question of whether the subsequent sale of the assets was executed in accordance with the Board's regulations: If the receivership was improper, the sale was *ipso facto* improper.[4] If we find for the agency on the receivership issue, we will then consider whether the sale of the assets was carried out in a constitutional manner.

## IV. Custody Under State Law

Finally, Telegraph seeks modification and clarification of our ruling that violations of state law in connection with the state's takeover of the Association were irrelevant to the legality of the federal receivership. In the main, we based our ruling on the legislative history which revealed that the provisions for federal receiverships were enacted to protect the interests of the FSLIC. We noted that the FSLIC's interests are put at risk whenever a state takes custody of an association and that its interests are equally threatened when the state takes custody in violation of, rather than in accordance with, state law.

The discussion recorded in the seven pages does not pertain to the Board's decision, or the grounds upon which the Board based its decision, to place Telegraph in receivership. Rather, the seven pages deal exclusively with one factor affecting the viability of a proposal for the disposition of Telegraph's assets *after* the receivership was to become effective. The one factor was the status of certain moneys contributed by Telegraph by a "preferred shareholder." The Board wrestled with the question whether the contribution was debt or equity. Insofar as the discussion was joined by the

Board and its counsel and treated the Board's defense to a potential lawsuit, we agree that it is protected by the attorney-client privilege. It does not compromise that privilege, however, to state that the Board concluded that the $1 million should be considered a contribution to Telegraph's capital. The record also states that the Board included the $1 million in its calculations of the Association's net worth.

4. We do not at this point address the question of what remedy would be feasible in that event.

Telegraph insists, however, that the legality of the receivership must be tested under state law since federal officials were involved—through the preparation of documents and the rendering of counsel—in the state's allegedly unlawful custody action. As we pointed out in our opinion, the legislative history of the receivership provisions of the Bank Protective Act makes it exceedingly clear that the legality of federal receiverships is not to be tested under state law. Mem.Op. 13. The pertinent portion of the Senate Report states:

If the Board elects to appoint the FSLIC under Federal law rather than accept the State appointment, any subsequent legal challenge to the FSLIC as receiver would come under section 5(d)(6)(A) of the Home Owners' Loan Act which provides for judicial review.

The effect of the legislation would be to enable the FSLIC to defend its appointment under Federal law *instead of requiring it to defend the legality of the State savings and loan administrator's determinations under State law.*

S.Rep. No. 1263, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code & Ad.News 2530, 2540. Congress thus recognized that the effective execution and administration of a federal receivership depends in large part on its being tested under uniform federal law. Where the legality of the appointment turns on the law of each state, the variables affecting the legality of the appointment increase and the decisiveness of the receiver's action may be compromised. Furthermore, insofar as the multiplicity of state laws provide an obstacle to the federal receivership, the ability of the FSLIC to protect its assets may be adversely affected.

Adoption of Telegraph's argument would require us to do just what the legislative history precludes. That is, it opens every federal receivership to attack on the grounds that federal officials violated some aspect of state law. Thus, every suit brought under 12 U.S.C. § 1464(d)(6)(A) could only be resolved after it is first determined whether the state custody proceeding violated a state statute and whether the federal officials participated in the viola-

tion. Under such a scheme, the strong interest of the federal agencies in defending federal receiverships under uniform federal law would be seriously compromised. We do not believe Congress intended such a result.

■ Additionally, Telegraph may be asserting that the complicity of federal officials in the allegedly wrongful state action was so extensive that the takeover was not accomplished "by or under" the state law, but rather was the result of federal coercion. In support of this theory, plaintiffs have offered to prove that a series of meetings took place wherein the federal officials, and their attorneys, counseled and instructed the state on all aspects of the events of May 22, 1980, including the state's taking of custody." Pltf's Mem., 11. However, even assuming such proof, we still would not find that the role played by the federal officials was so excessive as to supplant the state action. As this court stated at an earlier hearing.

Now, secondly, I don't know that there is anything wrong with these people having gotten together and planned how this thing was going to work. In fact, it seems to me that it would be unwise not to get together and coordinate their efforts.

It doesn't seem to me that the State Commissioner should take custody without knowing what is going to happen after that; and it is perfectly natural that he would confer with whoever it was who was going to appoint the receiver; and it also seems perfectly natural to me that they would confer with someone with a view toward that third party assuming the operations of the bank, under the statutory procedure which contemplates that being done in certain circumstances.

Tr. Hrg. 3/20/80 (J. Grady). For this reason, excessive federal involvement of the sort plaintiff has offered to prove does not alter our conclusion that Telegraph was closed by or under the laws of Illinois.

880

■

■ This does not mean, however, that state savings and loan associations have no remedies against either state or federal officials for acts in violation of state law. Ill.Rev.Stats. ch. 32, § 852, provides for an action to enjoin custody unlawfully acquired and may provide the basis for a damage action.[5] Further, where federal officials act in complicity with state defendants to deprive a person of constitutional rights, the federal defendants may be liable in damages under 42 U.S.C. § 1983. *Hampton v. Hanrahan*, 600 F.2d 600, 623 (7th Cir.1979). Finally, while we express no definite opinion, we note that plaintiff may be able to obtain relief against the federal agencies, the sovereign immunity doctrine notwithstanding, where a constitutional violation or *ultra vires* act is alleged and where the remedy would not impose an "intolerable burden on government functions, outweighing any consideration of private harm." *Schlafly v. Volpe*, 495 F.2d 273, 280 (7th Cir.1974).

While such causes of action against the federal and state defendants may provide plaintiff with monetary relief, we made it clear in our earlier opinion that they may not be used as vehicles to attack the federal receivership. Mem.Op., 5. The receivership may be tested exclusively under 12 U.S.C. §§ 1464(d)(6)(A) and 1729(c)(2) and it is plaintiff's cause of action under these statutes with which we are concerned.

If plaintiff's attack on the receivership proves unsuccessful, we shall then have to determine whether any other federal claims remain. If no such claims remain, we will then consider whether we should entertain the purely state law claims raised by the complaint or whether we should defer to the state tribunal in which the state law claims were simultaneously filed. We recognize that Telegraph's action has been dismissed from state court on the grounds that this court had taken jurisdiction over the federal and state claims. Plaintiffs have appealed the dismissal to the state appellate court, which is holding a decision in abeyance pending the outcome of our case. Should we decide that the state court is the proper forum for the resolution of the state court claims, we would dismiss the state law claims without prejudice.

The motion to modify the Memorandum Opinion of June 9, 1981, is denied.

---

**5.** See comments of Judge Higgins in Plaintiff's Memorandum Regarding Prior Rulings, Tr. Proc. 6/30/80 at 11–12.