720 F.2d 1499
 BISCAYNE FEDERAL SAVINGS & LOAN ASSOCIATION, et al.,
Plaintiffs-Appellees, Cross-Appellants,
v.
FEDERAL HOME LOAN BANK BOARD and Federal Savings & Loan
Insurance Corp., Defendants-Appellants, Cross-Appellees,
Richard T. Pratt, et al., Defendants.
 Nos. 83-5432, 83-5654.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 29, 1983.
 
 Squire, Sanders & Dempsey, Christopher D. Jackson, Miami, Fla., J. Michael Nifong, James A. Smith, Cleveland, Ohio, for defendants-appellants, cross-appellees.
 
 
 1
 Alston & Bird, Sidney O. Smith, Ben F. Johnson, III, Atlanta, Ga., Harvey Simon, John E. Gunther, Washington, D.C., Eben G. Crawford, Cleveland, Ohio, for Federal Home Loan Bank Bd.
 
 
 2
 Arky, Freed, Stearns, Watson & Greer, P.A., Bruce W. Greer, Peter W. Homer, Miami, Fla., for Biscayne Federal S & L.
 
 
 3
 Stanley Marcus, U.S. Atty., Ana Barnett, Asst. U.S. Atty., Miami, Fla., for other interested party.
 
 
 4
 Appeals from the United States District Court for the Southern District of Florida.
 
 
 5
 Before FAY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 
 FAY, Circuit Judge:
 
 6
 This case is a consolidated appeal from two orders entered in the United States District Court for the Southern District of Florida. It has its origin in a dispute over the Federal Home Loan Bank Board's (FHLBB or "the Board") appointment, pursuant to 12 U.S.C. Sec. 1729(b) (1982), of the Federal Savings and Loan Insurance Corporation (FSLIC) as federal receiver for a federally chartered association, Biscayne Federal Savings and Loan Association ("Biscayne"). The appointment of the FSLIC triggered an action by Biscayne and its majority shareholder pursuant to 12 U.S.C. Sec. 1464(d)(6)(A) seeking an order requiring the Board to remove the receiver. The FHLBB and the FSLIC, defendants below and appellants here, appeal from the district court's April 12, 1983 order, 561 F.Supp. 1046, issued in the nature of a preliminary injunction, which prevented the defendants from disposing of Biscayne's assets pending a trial on the merits of the propriety of the Board's intervention. The FHLBB and the FSLIC also appeal from the district court's September 9, 1983 holding, issued subsequent to a bench trial, that they improperly seized Biscayne and from that court's accompanying order that the FHLBB and the FSLIC should therefore devise a plan whereby the FSLIC would be removed as receiver and the assets held by the receiver returned to Biscayne. The September 9 order in effect continues the April 12 injunction, as it prohibits the FSLIC from taking any further action with regard to Biscayne. Because we find that the Board and the FSLIC satisfied the statutory requirements for the appointment of a federal receiver under 12 U.S.C. Secs. 1729(b) and 1464(d)(6)(A) and that the district court therefore had no authority to remove the FSLIC as receiver or force a return of Biscayne's assets to its shareholders, we reverse and vacate both orders of the district court.
 
 FACTS AND PROCEDURAL BACKGROUND[1]
 
 7
 Biscayne began experiencing financial difficulties with the rise of interest rates in the late 1970's. These difficulties were endemic to the savings and loan ("S & L") industry, as the historical practice by S & Ls of accepting savers' deposits, paying interest at low fixed rates on those deposits and then reinvesting the deposits in long-term loans with slightly higher fixed rates left the S & Ls vulnerable to the effects of the recent inflationary spiral. Many of these institutions were unable to overcome the changes in the financial market which resulted from the rising interest rates and widespread deregulation of that market. Investors in the late 1970's began moving their funds out of S & Ls and into other liquid investments which produced higher rates of return. As funds were depleted from the S & Ls, most of those institutions were unable to make new loans and were forced to borrow money elsewhere at high market rates to support their existing loan commitments.
 
 
 8
 Caught up amid the industry upheaval, Biscayne in July 1981 reported the first annual loss in its history, and its positive net worth of $31,850,000 began to erode. In light of the continuing losses projected, Kaufman & Broad, Inc., a multinational corporation and Biscayne's majority shareholder, contacted the FHLBB to discuss possible strategies for recapitalizing Biscayne. From July of 1981 through March of 1983, Biscayne, through Kaufman & Broad, and the Board negotiated unsuccessfully in search of a mutually acceptable plan to save Biscayne from receivership. During that time, Biscayne's net worth dropped from a positive $24 million to a negative $30 million.[2]
 
 
 9
 At 2:05 p.m. on April 6, 1983, after Biscayne's net worth had dropped below a record negative $30 million, the Board appointed the FSLIC as receiver for Biscayne pursuant to 12 U.S.C. Sec. 1729(b) (1982) on the grounds that Biscayne was insolvent and in an unsafe and unsound condition. It is undisputed that Biscayne's negative net worth as of this date constituted statutory insolvency as defined in 12 U.S.C. Sec. 1464(d)(6)(A)(i) (1982).[3] Shortly thereafter, the FSLIC as receiver took possession of the property and assets of Biscayne and conveyed them to a new federal mutual association, New Biscayne Federal Savings and Loan Association of Miami ("New Biscayne"). Within hours after the FSLIC had taken possession, Biscayne and Kaufman & Broad as its principal shareholder filed an action pursuant to 12 U.S.C. Sec. 1464(d)(6)(A) seeking an order requiring the Board to remove the receiver. Joined as defendants were the Board and the FSLIC in both its receivership and corporate capacities. The plaintiffs also filed a motion for a temporary restraining order (TRO) which would prevent the Board from acting upon Biscayne's assets. On April 12, 1983, after conducting several hearings on preliminary motions, the district court entered an order which denied Biscayne's motion for a TRO[4] but which enjoined the Board and the FSLIC from selling or otherwise disposing of Biscayne's assets pending the outcome of a trial on the merits. The defendants FHLBB and the FSLIC immediately appealed from that order.
 
 
 10
 Pursuant to statutory preference the matter was expedited and from April 28, 1983 through June 14, 1983, the district court, sitting without a jury, conducted a trial on the merits as to the propriety of the Board's appointment of a receiver. On September 9, 1983, the district court entered a memorandum opinion, examining allegations of wrongdoing on the part of the Board and the FSLIC, which Biscayne had brought under five counts, and ruling that Biscayne should be returned to its shareholders.[5] On September 21, 1983, the Board and the FSLIC filed their notice of appeal from the September 9 order. On September 29, 1983, this court granted defendants-appellants' motion to expedite this appeal and to consolidate it with the appeal from the April 12 order. Briefs were filed and oral argument conducted on November 15, 1983.
 
 
 11
 The district court found in favor of Biscayne under Count II of the complaint which alleged that the Board's appointment of a receiver constituted "an abuse of discretion, was arbitrary and capricious, was undertaken contrary to prior representation, and was not warranted by the facts and circumstances." The Board and the FSLIC contend that this was error because the court did not have the jurisdictional power to rule on this issue. It was this malfeasance of the Board that the district court used as the predicate for its conclusion that the Board was not authorized to appoint a receiver for Biscayne. We reverse the district court's order as to Count II and direct that the court enter judgment for the defendants. The court held the contention under Count III, that the Board should have availed itself of a less drastic remedy than receivership, to be without merit.[6] In a cross-appeal, Biscayne challenges as erroneous the district court's entry of judgment in favor of defendants as to Count III. We agree with the district court as to this count.
 
 THE ISSUES
 A. THE BOARD'S CAPACITY TO ACT
 
 12
 The district court reviewed in detail the entire course of conduct engaged in by the FHLBB staff throughout its twenty months of negotiations with Kaufman & Broad and Biscayne, particularly the staff's refusal to seriously consider proposals made by Kaufman & Broad to alleviate Biscayne's financial crisis. It found that the conduct of the staff during the period from late in 1982 to April 6, 1983 was arbitrary, capricious and an abuse of discretion. Specifically, the court found, inter alia, that on several occasions the Board's staff had deliberately misrepresented the Board's position with regard to a branch sale proposal made by Kaufman & Broad in hopes of generating working capital. As Board approval was a prerequisite for any action taken by Biscayne during the relevant period of negotiations, such deception by the Board's staff was found to have caused the plaintiffs much needless time and expense. The court characterized the Board's conduct as "outrageous," "outlandish," "egregious" and "wrapped in a shroud of deception."[7] Recognizing that the district court found a pattern of outrageous conduct on the part of the Board's staff, and without reviewing whether or not that finding is clearly erroneous, we hold that the trial court as a matter of law had no authority to grant the relief ordered.
 
 
 13
 The statutory scheme which prescribes the procedure for the appointment of a conservator or receiver for federal savings and loan institutions is unambiguous. 12 U.S.C. Sec. 1729(b) (1982) authorizes the FSLIC to be appointed as conservator or receiver of any federal savings and loan institution which is in default. It further authorizes the FSLIC, once the receivership has been established, to take "such action as may be necessary to put [the institution] in a sound and solvent condition." Section 1464 of the same statute complements the grant of authority under Sec. 1729(b), as it delineates five grounds which authorize the FSLIC's appointment. One of the grounds expressly stated in Sec. 1464 authorizes the Board to appoint a receiver for an insolvent association:
 
 
 14
 The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members.... If, in the opinion of the Board, a ground for the appointment of a conservator or receiver exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver for the association.[8]
 
 
 15
 12 U.S.C. Sec. 1464(d)(6)(A).
 
 
 16
 The statute also authorizes an association which has been placed in receivership to bring an action in the federal courts for removal of the FSLIC as receiver:
 
 
 17
 In the event of such appointment, the association may, within 30 days thereafter, bring an action in the United States district court ... for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver....
 
 
 18
 Id.
 
 
 19
 These statutory provisions, created by Congress as part of the Home Owners' Loan Act of 1933,[9] function as an integral part of the congressional plan to protect depositors through the Act and to restore the public faith in financial institutions which was eroded by the monetary crises of the Depression. Recognizing that swift action is often necessary to minimize economic loss in instances of troubled and failing financial institutions, Congress has given, in the statutory provisions at issue here, an awesome amount of control and authority to the FHLBB in the event of such crises.
 
 
 20
 We find that in actions brought under Sec. 1464(d)(6)(A), the sole question properly before the district court and this Court is whether a statutory ground authorizing the appointment of the FSLIC exists. The statute, while authorizing a role for the courts in review of appointment decisions, does not expressly define the scope of judicial review. However, the limits of such a review seem clearly apparent: a determination as to whether one of the statutory grounds has been met. When one of the stated grounds relied upon by the Board is statutory insolvency, as is the case here, the issue for the courts should be a straightforward one: whether the association in question was statutorily insolvent at the time of the FSLIC's appointment.
 
 
 21
 In this case statutory insolvency was established at the first pre-trial hearing in the district court, since plaintiffs at that time stipulated to the fact of Biscayne's insolvency as of April 6, 1983.[10] Any allegations by plaintiffs as to Biscayne's liquidity at that time or as to its potential to pull itself out of its dire circumstances are simply irrelevant. Section 1464, in our opinion, gives courts very limited jurisdiction, permitting a suit by an association subject to the Board's intervention for solely one purpose--that of ascertaining whether a statutory ground exists to support the Board's action. The statute does not require the Board to negotiate with or set guidelines for restructuring a failing association. The undisputed satisfaction of a statutory ground for the appointment of a receiver, coupled with the fact that there was no finding by the trial court that the Board's "outrageous conduct" in any way contributed to Biscayne's insolvent status as of April 6, thus renders the district court without authority to proceed further.
 
 
 22
 Other courts that have addressed the legality of Board conduct in analogous circumstances have likewise held that the scope of judicial review under Sec. 1464 should be limited to determining whether or not at least one of the five statutory grounds for appointing a receiver existed as of the date the receiver was appointed. In Telegraph Savings and Loan Association v. FSLIC, 564 F.Supp. 862 (N.D.Ill.1981), aff'd sub nom., Telegraph Savings and Loan Association v. Schilling, 703 F.2d 1019 (7th Cir.1983), petition for cert. filed, 52 U.S.L.W. 3123 (U.S. Aug. 23, 1983) (No. 83-244), the state commissioner took custody of an association under Illinois law and the Board then appointed the FSLIC as receiver. The Seventh Circuit discussed at length the proper role of the courts in reviewing the appointment of federal receivers under 12 U.S.C. Secs. 1729 and 1464(d)(6)(A) (1982).[11] It approved the trial court's conclusion that under the legislative scheme a federal court may hold a "trial on the merits," which is
 
 
 23
 limited to the issue of whether the Board has statutory authority to appoint the FSLIC receiver. We are concerned in this proceeding not with the reasonableness or wisdom of the Board's conduct, but only with the question of whether the requirements of Section 1729(c)(2) existed at the time Telegraph passed into receivership.
 
 
 24
 564 F.Supp. at 870.
 
 
 25
 When the association moved for a modification of the court's order, the Telegraph court upheld its decision, finding that "[t]he wisdom of the Board's decision to exercise its power of receivership is an issue that Congress has rested in the Board and that is 'not subject to re-examination in the federal courts under the guise of judicial review of agency action.' " Id. at 875 (quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)).
 
 
 26
 The decision by the United States Court of Appeals for the Ninth Circuit in Fidelity Savings and Loan Association v. FHLBB, 689 F.2d 803 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983), reversing a district court order which had mandated removal of a federal receiver, see 540 F.Supp. 1374 (N.D.Cal.1982), also held the scope of judicial review under Sec. 1464 to be severely restricted. In Fidelity, the district court stated that once it has determined that the three prerequisites under Sec. 1729(c)(2) for the federal takeover of a state savings and loan institution have been satisfied, including the finding of a ground for intervention under Sec. 1464(d)(6)(A), the court will not disturb the decision of the Board to exercise its jurisdiction unless there has been an abuse of discretion in the exercise of that power. The district court therefore did examine the Board's conduct in order to determine whether or not the Board had acted precipitously and overzealously. It ordered removal of the federal receiver. The appellate court reversed and remanded to the district court, stating in very clear language that the district court was only to consider whether any one of the conditions required by Sec. 1729(c)(2)(B) for the federal takeover of a state savings and loan institution existed prior to the Board's appointment of the FSLIC as receiver.
 
 
 27
 Nor do we agree with the contention by the plaintiffs that the district court's opinion in Washington Federal Savings and Loan v. FHLBB, 526 F.Supp. 343 (N.D. Ohio 1981), supports judicial review beyond an inquiry as to the existence of the statutory receivership grounds. In Washington Federal, the Board appointed a receiver for a solvent association (with a positive net worth of $12 million) on the basis of information before the Board that the association lacked sufficient funds or credit to meet its obligations, coming due in March of 1980, to purchase over $80 million of new securities. The Board rested its decision to appoint a receiver on two grounds listed in Sec. 1464: (1) an unsafe and unsound condition to transact business, and (2) substantial dissipation of assets due to violations of law or regulations and to unsafe or unsound practices. Both grounds admittedly require a more subjective determination by the Board as to an institution's condition than does a finding of statutory insolvency. In its action under Sec. 1464, the association claimed that the Board was misinformed concerning the "true condition of the institution on March 18, 1980" (the date of the receiver's appointment) and thus that the statutory requirements for Board intervention were not satisfied. That court did state that it had examined "whether the Board abused its discretion in reaching its opinion that a receiver should be appointed." Id. at 353-54. However, such a statement cannot be read to sanction de novo judicial review. Rather, the statement is attributable to the nature of the central issue throughout the trial: whether there were facts before the Board, when it acted, on which the Board could reasonably have concluded that "a" statutory ground existed for the appointment of a receiver. The abuse of discretion standard referred to in Washington Federal therefore focuses on whether the facts before the Board supported one or more of the Sec. 1464 statutory grounds for intervention relied upon. It does not, as plaintiffs contend, sanction the second-guessing of Board judgment once such statutory grounds have been satisfied. While the court in Washington Federal correctly observed that the Board does not have the "absolute power to decide whether a ground exists for appointing a receiver," id. at 353, the court also held that "[f]actors are only relevant if they may be subsumed under 'one or more' grounds that form the basis of the Bank Board's 'opinion' to order a receivership." Id. at 354.
 
 
 28
 Under the facts of our case, no such inquiry need be made, as the parties have stipulated to the existence of a statutory ground--insolvency--sufficient to sustain the appointment of a receiver on April 6, 1983. At this point judicial inquiry ends!
 
 B. THE LESS DRASTIC REMEDY CLAIM
 
 29
 In a cross-appeal, the plaintiffs-appellees urge this court to reverse the district court's holding as to Count III of the complaint. In Count III the plaintiff contends that the Board, in view of the protracted negotiations between Biscayne and its staff and the absence of any exigent circumstances surrounding Biscayne's financial straits, should have undertaken a less drastic remedy than receivership for Biscayne. The trial court rejected this contention and entered judgment for the defendants on Count III. We sustain the trial court's ruling, although our rationale is somewhat different. As we emphasized above, there is nothing in the statute at issue here which authorizes a court to second-guess the Board's choice of action as to a failing savings and loan association once the requirements of Sec. 1729(b) and, by incorporation, Sec. 1464, have been met with regard to that association. The discretion available under this legislation has been delegated to the Board, not the courts.
 
 
 30
 We are also aware that there are claims still pending in the district court brought by the plaintiffs-appellees against the individuals involved in this suit under Bivens theories. See Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). As to those claims, the issue of "outrageous conduct" by the FHLBB staff may be relevant. However, this decision does not affect those claims and we make no rulings as to the merits of such.[12]
 
 CONCLUSION
 
 31
 Finding that the district court had no authority to disrupt the appointment of, or limit the authority of, the FSLIC as receiver for Biscayne once a statutory ground for receivership has been found to exist, we REVERSE and VACATE both orders of the district court. We direct that the district court enter judgment in favor of defendants as to Count II. We AFFIRM the court's ruling as to Count III.
 
 
 
 [1]
 The relevant facts are recited in shortened form due to the nature of the case, the fact that it deserves preferential treatment, and because the issues in our opinion are primarily straightforward
 
 
 [2]
 Biscayne's book value net worth, rounded to the nearest $10,000, was as follows during the relevant period:
 Month Net Worth
-------------- -------------
July 1981 $ 31,850,000
August 1981 29,590,000
September 1981 26,550,000
October 1981 23,820.000
November 1981 20,570,000
December 1981 16,770,000
January 1982 11,780,000
February 1982 8,890,000
March 1982 8,310,000
April 1982 4,990,000
May 1982 900,000
June 1982 690,000
July 1982 (3,933,520)
August 1982 (8,676,277)
September 1982 (12,443,346)
October 1982 (16,813,043)
November 1982 (19,856,031)
December 1982 (22,496,612)
January 1983 (24,713,900)
February 1983 (27,387,061)
March 1983 (29,103,258)
 
 
 [3]
 The parties stipulated during an initial hearing in April 1983 that Biscayne was insolvent within the statutory definition as of the date of the Board's action. See Trial Transcript at 27-28, 91-92, 98
 
 
 [4]
 The court denied the motion due to the plaintiffs' failure to make "a sufficient showing of substantial threat or irrevocable injury." See April 12, 1983 Order
 
 
 [5]
 The plaintiffs-appellees' complaint at trial contained nine counts. Counts I through V named the FHLBB, the FSLIC and the FHLBB officers in their official capacities. Counts VI through IX named the individuals in their individual capacities under a Bivens theory. See Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The court bifurcated Counts I through V from Counts VI through IX. The district court's opinion on appeal here addresses only Counts I through V
 
 
 [6]
 The district court also found for defendants-appellants as to Counts I, IV and V. Under Count I, plaintiffs concede that Biscayne was statutorily insolvent, but assert that the Board is estopped from asserting insolvency as a basis for the appointment of a receiver in that the Board's conduct caused the insolvency. The trial court found that neither the Board nor its staff were guilty of conduct causing the insolvency and that estoppel was not applicable to this governmental function. Under Count IV, plaintiffs assert that the Board's ex parte appointment of a receiver violated Biscayne's due process rights. In Count V, plaintiffs claim that their equal protection rights were violated by the Board's action in placing Biscayne under receivership while not taking such action with regard to other similarly situated institutions. Both theories were rejected by the trial court. None of these rulings is challenged
 
 
 [7]
 September 9, 1983 Order at 102, 106
 
 
 [8]
 The other grounds listed in the statute include: (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules, or regulations, or to any unsafe or unsound practice or practices; (iii) an unsafe or unsound condition to transact business; (iv) willful violation of a cease-and-desist order which has become final; (v) concealment of books, papers, records, or assets of the association or refusal to submit books, papers, records, or affairs of the association for inspection to any examiner or to any lawful agent of the Board. 12 U.S.C. Sec. 1464(d)(6)(A)(ii)-(v)
 
 
 [9]
 Home Owners' Loan Act of 1933, ch. 64, Sec. 1, 48 Stat. 128
 
 
 [10]
 See supra note 3
 
 
 [11]
 The powers of the Board in instances of default by a state savings and loan institution are delineated in 12 U.S.C. Sec. 1729(c)(2) (1982). Section 1729(b), which establishes the Board's powers on default of federal S & L's and is thus dispositive here, grants even greater discretion to the Board than the section at issue in Telegraph
 
 
 [12]
 The findings of the trial court as to the conduct of certain staff members are shocking. Our ruling today should not be interpreted as approving or condoning in any way such actions, if supported by the record, by representatives of governmental agencies. What we hold is that such questionable conduct will not and cannot support the relief ordered by the district court. These issues simply have no relevancy in determining whether or not statutory grounds existed for the Board's appointment of FSLIC as receiver or to the power of the receiver to carry out its responsibilities