**ALLIANCE FEDERAL SAVINGS AND LOAN ASSOCIATION, et al., Plaintiffs-Appellants,**

v.

**FEDERAL HOME LOAN BANK BOARD, John J. Daly, Defendants-Appellees.**

No. 85–3229.

United States Court of Appeals, Fifth Circuit.

Feb. 12, 1986.

Harry M. Zimmerman, Jr. and J. Broocks Greer, III, New Orleans, La., for plaintiffs-appellants.

Harold B. Carter, Jr. and Stephen L. Williamson, New Orleans, La., Loretta Reid Pitt, Federal Home Loan Bank Bd., Temple Hills, Md., William K. Black and Ralph W. Christy, Attys., Washington, D.C., for defendants-appellees.

Before CLARK, Chief Judge, THORN-BERRY, and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

If ever an enterprise chartered as an alleged savings and loan association deserved the appointment of a conservator to preserve the integrity of the financial community, this is it.

Alliance Federal Savings and Loan Association (Alliance) was granted its charter as a federal mutual savings and loan association on July 14, 1980. On April 8, 1981, Alliance became a member of the Federal Home Loan Bank Board (FHLBB or Bank Board) system and was protected under that system's insurance provisions. On that same date, Alliance opened its doors to the public at its main office in Kenner, Louisiana.

Almost from its inception, Alliance became the focus of heightened scrutiny by the Office of Examinations and Supervision of the FHLBB. Seven months after it opened, an examination conducted by the Bank Board disclosed a number of major operational deficiencies. Meetings between Alliance and the Bank Board resulted in a refusal by Alliance to correct the operational irregularities discovered by the Bank Board. Thus, on August 26, 1982, the Bank Board issued a cease-and-desist order pursuant to 12 U.S.C. § 1464(d)(2)(A). Alliance consented to the entry of the order. At that time, Alliance had a negative net worth in excess of $500,000, according to its monthly report for October 1982, and the Bank Board required that its directors increase their pledged savings from $250,-000 to $925,000.

The second regulatory examination of Alliance commenced in December 1982, and disclosed numerous violations of the cease-and-desist order, as well as other unsafe and unsound lending practices. The Bank Board sought judicial enforcement of the cease-and-desist order. On June 11, 1984, Alliance consented to the enforcement decree.

The Bank Board began its third regulatory examination of Alliance in July of 1984. The examination had not been completed at the time the conservator was appointed. Three interim reports for the 1984 examination were submitted by the examiners. These reports disclosed unsafe and unsound lending practices, dissipation of assets, and continued violations of the court-enforced cease-and-desist order. It was after the third interim report that the Bank Board determined that appointment of a conservator for Alliance was necessary.

The Bank Board's appointment of a conservator was based on three separate statutory grounds: (1) substantial dissipation of assets or earnings due to any violation or violations of law, rules, or regulations, or to any unsafe or unsound practice or practices; (2) an unsafe or unsound condition to transact business; and (3) willful violation of a final cease-and-desist order. 12 U.S.C. § 1464(d)(6)(A). On January 31, 1985, the Bank Board appointed a conservator for Alliance.[1] On February 4, 1985, a group of former officers and directors of Alliance filed this suit to remove the conservator under the special provisions of 12 U.S.C. § 1464(d)(6)(A).

Proceedings in the district court were expedited and a bench trial commenced on April 15, 1985. Not one officer or director of Alliance testified. At the close of the first day of trial, Alliance rested and the Bank Board moved for an involuntary dismissal pursuant to Fed.R.Civ.P. 41(b).

The following day, the court conducted a hearing on the Bank Board's Rule 41(b) motion, and concluded that Alliance had willfully violated the cease-and-desist order, and that Alliance had engaged in unsafe and unsound lending practices which had resulted in the substantial dissipation of assets. The Bank Board's motion for involuntary dismissal pursuant to Rule 41(b) was granted. Final judgment was entered on April 17, 1985, in favor of the Bank Board. Alliance filed a timely notice of appeal.

 On appeal, Alliance raises a plethora of issues all challenging the Bank Board's exercise of its authority under 12 U.S.C. § 1464(d)(6)(A). Under the limited review permitted this court, we find that the Bank Board established the existence of one of the statutory grounds for the appointment of a conservator and, accordingly, we affirm the judgment of the district court.

Section 1464(d)(6)(A) provides:

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules, or regulations, or to any unsafe or unsound practice or practices; (iii) an unsafe or unsound condition to transact business; (iv) willful violation of a cease-and-desist order which has become final; (v) concealment of books, papers, records, or assets of the association or refusal to submit books, papers, records, or affairs of the association for inspection to any examiner or to any lawful agent of the Board. The Board shall have exclusive power and jurisdiction to appoint a conservator or receiver. If, in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver for the association. In the event

---

**1.** On August 23, 1985, the Bank Board replaced the conservator with a receiver, the Federal Savings and Loan Insurance Corporation (FSLIC), pursuant to 12 U.S.C. § 1464(d)(6)(D).

of such appointment, the association may, within thirty days thereafter, bring an action ... for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver.

12 U.S.C. § 1464(d)(6)(A). Although authorizing a role for the courts in reviewing the Bank Board's decision to appoint a conservator, the statute does not expressly define the scope of judicial review. Congress has vested a vast amount of control and authority in the FHLBB to regulate savings and loan associations. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159–67, 102 S.Ct. 3014, 3025–30, 73 L.Ed.2d 664 (1982). Taking this into consideration, we agree with the Eleventh Circuit that our jurisdiction to review the Bank Board's decision to appoint a conservator is limited to a determination whether one of the statutory grounds enumerated in § 1464(d)(6)(A) existed at the time of the appointment of the conservator. *See Biscayne Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 720 F.2d 1499, 1503–04 (11th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984).[2] We find that there was more than sufficient evidence to support the Bank Board's finding that Alliance had engaged in unsafe and unsound lending practices which had resulted in the substantial dissipation of assets.

The first regulatory examination of Alliance in November 1981, revealed that more than 75% of Alliance's loan portfolio involved major speculative construction, land acquisition, and commercial real estate loans, many of which were of substandard quality. The examination further revealed that these risky loans were funded primarily by brokered or wholesale jumbo ($100,-000) certificates of deposit, which comprised more than 85% of Alliance's total savings. As of December 31, 1981, Alliance had experienced a net loss of $108,922 because of the high rate of interest it was required to pay on the jumbo certificates and because uncollected interest had accrued on the speculative construction loans which had matured and were not repaid. After the reflected losses of 1981, Alliance consented to the entry of the cease-and-desist order.

Alliance nevertheless continued its practice of making imprudent loans and suffered an increasingly negative net worth continuing through the date of appointment of the conservator.[3] As of mid-1983 Alliance's own auditors confessed their inability to express an opinion on the association's financial condition because of its poor internal accounting records and loan documentation. In response to the 1982 examination, the Bank Board sought, and Alliance consented to, judicial enforcement of the cease-and-desist order.

The 1984 regulatory examination of Alliance began in July and had not been com-

---

**2.** *Cf. Fidelity Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 689 F.2d 803, 810 (9th Cir.1982) (finding that once the three prerequisites for the federal takeover of a state savings and loan institution have been satisfied, the court will not disturb the decision of the Bank Board to exercise its jurisdiction unless there has been an abuse of discretion in the exercise of the Board's power), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *San Marino Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 605 F.Supp. 502, 508 (C.D.Cal.1984) (reviewing the Bank Board's appointment of a conservator under the arbitrary and capricious standard); *Tel. Sav. & Loan Ass'n v. FSLIC*, 564 F.Supp. 862, 869–71 (N.D.Ill.1981) (holding that the association is entitled to a *de novo* hearing on the merits limited to the issue whether the Bank Board had the statutory authority to appoint a

receiver; the association need not go so far as to show that the Bank Board's decision was arbitrary or capricious, only that the decision was incorrect by the "greater weight of the evidence"), *aff'd sub nom., Tel. Sav. & Loan Ass'n v. Schilling*, 703 F.2d 1019 (7th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983).

**3.** This court does not hold that a negative net worth or losses suffered by a savings and loan association are sufficient, in and of themselves, to permit the FHLBB to appoint a conservator pursuant to 12 U.S.C. § 1464(d)(6)(A)(ii). Rather, these facts are noted as proof that Alliance's reprehensible lending practices had the expected consequence of causing losses.

pleted at the time the conservator was appointed. Based on three interim reports, the Board was able to establish Alliance's financial condition as of December 31, 1984. As of that date, Alliance's net worth, taking into account an adjustment required by the Bank Board in October, would have been a negative $1,203,209. Furthermore, the examiners estimated that, when considering the estimated losses which they predicted as a result of the then yet unexamined loans, net worth may have been overstated by as much as $2.8 million. At the December 31, 1984, report, Alliance had experienced its fifth straight month of losses totalling more than $2 million. These figures did not include the potential losses on loans which Alliance had made since October of 1984. In October alone, Alliance originated $22 million in loans that had not been examined. Based on Alliance's consistently inadequate underwriting procedures, it was the opinion of the examiners that a number of those loans would have indicated losses.

Throughout its history, in defiance of repeated cease-and-desist orders and unfavorable examination reports, Alliance routinely made loans which did not comport with prudent banking practice. The first interim report focused on four related loans, made in September 1983, totaling $3.1 million. In 1984, all four of the borrowers were indicted for bank fraud. As of January 22, 1985, the loans had been due since September 1984, and had not been paid; the real and personal property securing the loans had been determined to be largely of no value; and uncollectible interest income and late charges totalled $86,193. On October 12, 1984, Alliance was directed to establish a reserve of $2,564,541 for the indicated losses. As of the date of the appointment of the conservator, the reserves had not been established.

The second interim report focused primarily on the heavy volume of construction and land acquisition loans. During the four month period from June 30 to October 31, 1984, Alliance had increased its assets by $73 million. Loans were literally being generated more rapidly than they could be reviewed. At this time, jumbo certificates of deposit comprised 78% of Alliance's savings account balances. Alliance was generating loans for $1 million and more, even though it lacked the ability to underwrite adequately these types of major loans. Unsecured commercial loans had been made in amounts up to $540,000 and some of the unsecured commercial borrowers were found to be borrowers on some of the major construction project loans. Many of the loan-to-value ratios were actually 100% on speculative construction and land acquisition projects. These loans had little or no cash equity and Alliance thus assumed the total risk. Major lending was based on appraisals that were severely inflated or insufficiently documented. Construction loans were discovered to have been made in excess of the cost estimates for actually constructing the properties. As of August 31, 1984, more than $18 million in loans was sixty days or more contractually delinquent. Finally, Alliance continued to attempt to sell participations in its substandard loans to other FSLIC insured institutions, resulting in indicated losses to those associations.

The record is replete with discussions and examples of imprudent loans made by Alliance. A few of those loans will be discussed here as examples of the unsafe and unsound lending practices which resulted in the substantial dissipation of assets. The Pierre Villere loan is a typical example of Alliance's inadequate pre-loan approval analysis of a borrower's indebtedness on the subject property and of the borrower's total indebtedness. A pre-loan review of the borrower's credit history would have revealed that the borrower was chronically delinquent in paying substantial loans to other institutions when Alliance granted a second mortgage on property, the proceeds of which was partially used to pay off an existing second mortgage and accrued interest. This loan resulted in the filing by Alliance of a delinquency judgment against Villere for $89,504.

The Edgewood Construction loan also involved highly questionable loan approval

standards. The original $850,000 loan was twelve months delinquent when Alliance restructured the loan in the form of five individual loans. Notwithstanding numerous appraisal deficiencies, these loans were all secured by the same properties with one appraisal report for all five loans. Alliance also increased its risk by restructuring the loan. The total of the new loans was $929,-967, $765,000 of which was used to pay principal, interest, and late charges on the original loan. Moreover, twenty lots which had secured the original loan were released from the collateral mortgage executed in conjunction with the new loans, thus reducing the available collateral upon default.

Alliance, in numerous instances, also prematurely committed itself to lend funds without ensuring that sufficient funds would be available to the borrower to complete the project. For example, Alliance committed to fund $4 million, subject to participants' funding $2 million, to acquire and renovate a casino in Las Vegas, Nevada. Alliance lent $2.3 million to fund the initial purchase of the Chapter 11 property without first obtaining participants. Alliance then refused to grant additional loans because of lack of additional participants. Appraisal deficiencies were noted on the property in that the only appraisal relied on in making the loan occurred 22 months prior to the loan date. The only evidence of a recent appraisal was a one-page letter of value which stated that no substantial increases in the value of the land had occurred since the previous appraisal. The indicated source of repayment of the loan was revenue from the casino. Since the borrower could not provide the remaining $1.7 million for renovation and operating capital to open the casino, revenues would never be received. Even if the borrower had arranged for participant funding, it does not appear from the record that the borrower had ever actually procured a gambling license to operate the casino.

Another project, the Fox Run Commons, involved an $8.97 million loan to twenty individual borrowers. Although numerous deficiencies were noted, the loan was classified as substandard primarily because of Alliance's blatant disregard of the appraisal report. The appraisal report, on its face, indicated that a loss was going to occur *when the loan was approved.* Based on that appraisal, an indicated loss of $714,117 was confirmed.

The third interim report was primarily directed at violations of the court-enforced cease-and-desist order. Nevertheless, it too revealed unsafe and unsound lending practices which also would be expected to result in the substantial dissipation of assets. For example, Alliance approved a $2.55 million loan on a property known as the Tahoe Marina Development. At the time of the loan, there were total outstanding mortgages of $5.85 million and Alliance was in the fifth lien position. Interest payments on these four prior liens were extremely high. Although initial appraisal of the project indicated a $22.3 million valuation, reappraisal by the same appraiser, this time properly taking into account a profit reduction and deduction for the remaining projected development costs, indicated a valuation of only $13.55 million. In addition to numerous appraisal deficiencies, there was no verification of the corporate borrower's ability to repay the loan or of the guarantor's personal ability to repay the loan and no verification of any financial statements of either the corporation or the personal guarantor. In fact, the credit reports on the personal guarantor indicated a series of collection problems and judgments.

The above-mentioned examples of loan transactions entered into by Alliance are not the exception but, in fact, are the rule as revealed by the record. It is unnecessary for this court to set forth further instances of the unsafe and unsound lending practices engaged in by Alliance which have resulted in the substantial dissipation of its assets. At the time of oral argument, counsel for the Bank Board noted that $129 million, or two-thirds, of Alliance's outstanding loans were nonperforming. Alliance presented no evidence at trial which rebutted any of the Bank Board's findings as revealed by the administrative

record. None of Alliance's officers or directors testified on its behalf. Although it would have been entitled to a trial *de novo* on the issue whether the Bank Board had the statutory authority to appoint a conservator as of January 31, 1985, it did not request such a trial, it presented no evidence, and the association's officers and directors failed to testify. Contrary to Alliance's assertion on appeal, we do not find that the Bank Board was required to establish the insolvency of the association as of the date of the appointment of the conservator. Such a construction of § 1464(d)(6)(A) would render its subsections (ii) through (v) mere excess verbiage, a result which we refuse to reach.

In view of the overwhelming amount of evidence that Alliance engaged in unsafe, unsound, and imprudent lending practices which resulted in the substantial dissipation of assets and, in fact, a documented negative net worth in excess of $1.2 million at the time the conservator was appointed, we AFFIRM the judgment of the district court.