**GUARANTY SAVINGS & LOAN ASSOCIATION, Appellant,**

v.

**FEDERAL HOME LOAN BANK BOARD,** Federal Savings and Loan Insurance Corporation, Beverly Bassett, Securities Commissioner for the State of Arkansas, and Guaranty Federal Savings and Loan Association, Appellees.

No. 85–2500.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1986.

Decided July 9, 1986.

Rehearing and Rehearing En Banc Denied Aug. 27, 1986.

Larry W. Burks, Little Rock, Ark., for appellant.

Joanne P. Underhill, Washington, D.C., for appellees.

Before LAY, Chief Judge, and ROSS and WOLLMAN, Circuit Judges.

ROSS, Circuit Judge.

Guaranty Savings and Loan Association (Guaranty) appeals from the district court's dismissal of its action to remove a receiver appointed by the Federal Home Loan Bank Board (FHLBB). We find that the district court did not err in dismissing Guaranty's action and accordingly affirm the judgment of the district court.

## FACTS

Guaranty is a federally insured savings and loan association chartered under the laws of the State of Arkansas. Its home office is in Harrison, Arkansas.

On December 5, 1985, the FHLBB appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as receiver for Guaranty. The Board's appointment of a receiver was based on two separate statutory grounds: 1) Guaranty was insolvent, and 2) Guaranty had incurred a substantial dissipation of assets or earnings due to violations of law, rules, or regulations, or due to unsafe or unsound practices. 12 U.S.C. § 1464(d)(6)(A)(i), (ii).

On December 9, 1985, Guaranty filed this action pursuant to 12 U.S.C. § 1464(d)(6)(A), seeking an order requiring the FHLBB to remove the receiver. Guaranty also requested an injunction requiring the FHLBB to maintain the status quo until the removal matter could be decided. The court denied injunctive relief on December 10, 1985.

Between December 11th and 13th, Guaranty presented its case on the merits. On December 13th, after Guaranty rested its case, the FHLBB moved for an involuntary dismissal pursuant to FED.R.CIV.P. 41(b). The district court granted the motion from the bench and later entered an order dismissing the action "by reason of the failure of Guaranty Savings & Loan Association to sustain its burden of proving that the Federal Home Loan Bank Board was arbitrary or capricious in its determination that a receiver should be appointed for Guaranty Savings & Loan Association, based upon the administrative record made before the Board at the time of reaching its decision on December 5, 1985." Order, December 17, 1985.

This court denied Guaranty's motion for a preliminary injunction on January 16, 1986, and expedited Guaranty's appeal on the merits. On appeal, Guaranty makes the following arguments: 1) the receiver should have been removed because the receivership had not been properly approved by the Arkansas Savings and Loan Supervisor, 2) the scope of review applied by the district court was improper, and 3) the district court erred in failing to find that the FHLBB acted arbitrarily or capriciously in appointing a receiver for Guaranty.[1]

## DISCUSSION

### 1. State Approval

The FHLBB's statutory authority to appoint the FSLIC as receiver for state chartered, federally insured savings and loan associations is contained in 12 U.S.C. § 1729(c). The subparagraph applicable to this case states:

Notwithstanding any provision of the constitution or laws of any State, or of this section, in the event the Federal Home Loan Bank Board determines that any of the grounds specified in section 1464(d)(6)(A)(i), (ii), or (iii) of this title exist with respect to an insured institution, other than a Federal association, the Board shall have exclusive power and jurisdiction to appoint the Corporation as sole conservator or receiver of such institution.

\*      \*      \*      \*      \*      \*

---

**1.** Guaranty also continues to argue that it is entitled to an injunction under the All Writs Act, 28 U.S.C. § 1651(a), to maintain the status quo until a trial *de novo* is held in the district court.

Because we affirm the district court's decision to dismiss Guaranty's action, we need not consider this argument.

The authority conferred by this subparagraph shall not be exercised without the *written approval* of the State official having jurisdiction over the State-chartered insured institution that the grounds specified for such exercise exist.

12 U.S.C. § 1729(c)(1)(B)(i)(I) and (ii)(I) (emphasis added). In sum, the FHLBB cannot impose a receivership under section 1729(c)(1)(B) unless it: 1) determines that one or more of the grounds specified in 12 U.S.C. § 1464(d)(6)(A) exist, and 2) obtains a "written approval" from the proper state official stating that the specified grounds exist.[2]

In this case, Beverly Bassett, the Arkansas Savings and Loan Supervisor, gave the FHLBB her "written approval" of the Guaranty receivership on December 5, 1985. Guaranty contends that the written approval was defective because Bassett did not comply with two Arkansas statutes: ARK.STAT.ANN. § 67–857 and ARK. STAT.ANN. § 67–1869.

■ Guaranty's contention is meritless, as neither of these statutes has anything to do with Bassett's authority to give the FHLBB written approval of a receivership pursuant to 12 U.S.C. § 1729(c)(1)(B)(ii)(I). Section 67–857 deals with Bassett's authority to ask the FSLIC to be receiver in a *state* receiveship, while this case involves a *federal* receivership. Section 67–1869 is even further off the mark. It deals with Bassett's authority to enforce cease and desist orders by obtaining injunctions, restraining orders, and writs of mandamus in state court.

### 2. Scope of Review

Guaranty next challenges the scope of review applied by the district court. In the proceedings below, the district court permitted Guaranty to submit a great deal of testimonial and physical evidence. But when the court ruled on the FHLBB's motion to dismiss, it restricted its review to the administrative record made by the FHLBB.[3] Also, the court applied the arbitrary or capricious standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and placed the burden of proof on Guaranty.

Guaranty argues that the court should have held a trial *de novo* and should have required the FHLBB to prove, by a preponderance of the evidence, that the statutory grounds for the appointment of a receiver existed. Guaranty's argument is based on the premise that the phrase "upon the merits", as it is used in 12 U.S.C. § 1464(d)(6)(A), means "trial *de novo*".

Section 1464(d)(6)(A) provides, in pertinent part, as follows:

In the event * * * [a receiver is appointed], the association may, within thirty days thereafter, bring an action in the United States district court for the judicial district in which the home office of such association is located * * * for an order requiring the Board to remove such * * * receiver, and the court shall *upon the merits* dismiss such action or direct the Board to remove such * * * receiver. (Emphasis added).

This statute authorizes judicial review of the FHLBB's decision to appoint a receiver but "does not expressly define the scope of judicial review." *Alliance Federal Savings and Loan Association v. Federal Home Loan Bank Board*, 782 F.2d 490, 493 (5th Cir.1986); *Biscayne Federal Savings and Loan Association v. Federal Home Loan Bank Board*, 720 F.2d 1499,

---

**2.** Exceptions to the written approval requirement are set forth in 12 U.S.C. § 1729(c)(1)(B)(ii)(II). None of the exceptions are applicable to this case.

**3.** The district court relied upon our decision in *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347 (8th Cir.1984). We stated:

Appellants correctly point out that when a court reviews agency action, it may not consider evidence outside the administrative record for the purpose of substituting its judgment for that of the agency. But that did not occur here. The district court admitted and used supplementary evidence only to explain the record and to determine the adequacy of the procedures followed and the facts considered by the Secretary in reaching his decision.

*Id.* at 357.

1503 (11th Cir.1983). We reject Guaranty's contention that the phrase "upon the merits" implicitly defines the scope of judicial review. To us, the "upon the merits" language of section 1464(d)(6)(A) merely means that the district court's decision to either dismiss the action or remove the appointed receiver should be based upon the merits of the action (i.e., whether statutory grounds for a receivership exist) rather than on procedural or policy oriented grounds.[4] In short, the "upon the merits" language of section 1464(d)(6)(A) means just what it says and nothing more.

■ "[I]n cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, [the Supreme] Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held." *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963).[5] This is such a case. Accordingly, we conclude that the district court correctly restricted its review to the administrative record.

■ We also conclude that the court was correct in applying the arbitrary or capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and in placing the burden of proof on Guaranty. First, section 1464(d)(6)(A) does not define the type of review to be used in examining the FHLBB's appointment decision. Thus, the court properly looked to the Administrative Procedure Act for guidance on this issue. *See, e.g., San Marino Savings and Loan Association v. Federal Home Loan Bank Board*, 605 F.Supp. 502, 508 (C.D. Cal.1984) (reviewing the FHLBB's appointment decision under the arbitrary or capricious standard); *Washington Federal Savings and Loan Association v Federal Home Loan Bank Board*, 526 F.Supp. 343, 350 (N.D.Ohio 1981) (same). Second, Guaranty brought this action challenging the FHLBB's appointment decision. That decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 415, 91 S.Ct. at 823. Thus, the burden of proof was properly placed on Guaranty. *See,*

4. We observe that the original opinion in *Alliance Federal Savings & Loan Ass'n v. Federal Home Loan Bank Bd.*, 782 F.2d 490, 496 (5th Cir.1986) contained the following sentence:

Although * * * [Alliance] would have been *entitled to a trial de novo* on the issue whether the Bank Board had the statutory authority to appoint a conservator as of January 31, 1985, it did not request such a trial, it presented no evidence, and the association's officers and directors failed to testify. (Emphasis added.)

After the *Alliance* opinion was filed, the FHLBB filed a petition for rehearing to have the reference to a right to a trial *de novo* omitted or clarified. By an order dated May 14, 1986, the *Alliance* panel granted the FHLBB's petition for rehearing and modified the original opinion by deleting the above sentence and by altering the sentence preceding it. Thus, in its final form, the *Alliance* opinion contains no reference to a right to a trial *de novo*. This omission is significant in view of its prior presence. But because the prior reference was dicta, we do not place controlling weight on its omission.

We also observe that two lower courts have held that the "upon the merits" language of 12 U.S.C. § 1464(d)(6)(A) entitles associations to a trial *de novo*. *Fidelity Savings & Loan Ass'n v. Federal Home Loan Bank Bd.*, 540 F.Supp. 1374, 1377–78 (N.D.Cal.), *rev'd on other grounds*, 689

F.2d 803 (9th Cir.1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.*, 564 F.Supp. 862, 868–70 (N.D.Ill.1981), *aff'd sub. nom. Telegraph Savings & Loan Ass'n v. Schilling*, 703 F.2d 1019 (7th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983). These decisions rely heavily upon policy reasons to support their interpretation of section 1464(d)(6)(A). If Congress wishes to amend section 1464(d)(6)(A) pursuant to the policy reasons expressed in those decisions, it may. We, however, decline to do so.

5. We note that 5 U.S.C. § 706(2)(F) of the Administrative Procedure Act has been interpreted by the Supreme Court as authorizing *de novo* review "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate" and "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *See also Camp v. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973). Because Guaranty does not contend that either of these situations exist here, we do not address these exceptions to the general rule proscribing *de novo* review of agency decisions.

e.g., *Telegraph Savings and Loan Association v. Federal Savings and Loan Insurance Corp.*, 564 F.Supp. 862, 870 (N.D.Ill. 1981), *aff'd sub. nom Telegraph Savings and Loan Association v. Schilling*, 703 F.2d 1019 (7th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983) (burden of proof is on the association in an action under section 1464(d)(6)(A)).

### 3. Arbitrary or Capricious

■ To determine whether the FHLBB's decision to appoint a receiver was arbitrary or capricious, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. * * * Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. [We are] not empowered to substitute [our] judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 823. Reviewing the record in this case, we agree with the district court's conclusion that the FHLBB's decision to appoint a receiver was not arbitrary or capricious.

The administrative record shows that Guaranty has been a "supervisory concern" of the FHLBB since 1983. The underlying problems with the institution were set forth in detail in an FHLBB examination report transmitted to Guaranty on March 9, 1984. The following excerpt summarizes the thrust of the report:

> Since total control of the institution was acquired by the Barrett family in December 1981, there has been a complete change in the management philosophy of the institution. The change has led to the "uncontrolled growth" of the institution as a result of the "over solicitation" of savings deposits and the employment of the funds in high risk investments. These abrupt changes in management policies have been implemented without the benefit of formal objectives, plans, policies or the normal system of checks

and balances to control and direct operation of the institution.

> \* \* \* \* \* \*

> Reflected throughout the examination report are comments on the lack of sound management policies in the savings, loans and investment areas of operations.

Joint Exhibit 1, Vol. II at 576.

The "over solicitation of savings deposits" referred to in the above excerpt was based on the fact that total savings increased from $47.6 million in December of 1982 to $279.9 million in October of 1983. Of particular concern was the fact that this growth was obtained primarily through the use of brokered deposits from outside Guaranty's normal market area. In December of 1982, brokered deposits represented 10.6% of Guaranty's total savings; that figure rose to 77.4% by October of 1983.

Of even greater concern was Guaranty's risky lending and investment practices. After the Barrett family assumed control, Guaranty became heavily involved in underwriting large, speculative loans for real estate acquisition, development, and construction projects across the nation. The loans reviewed by the examiners were described as being more like "ventures * * * than mortgage loans" because the "borrowers usually have little or no equity in the project" and "[t]he lender assumes most or all of the risks." *Id.* at 581. Despite the risks involved in these loans, the facts suggested that Guaranty conducted little or no independent investigation into the borrowers' creditworthiness and that appraisals of the real estate securing the loans were inadequate.

In an FHLBB examination report transmitted to Guaranty on January 31, 1985, the FHLBB examiners expressed continued concern with Guaranty's lending practices. The examiners conducted a thorough review of twenty-four commercial loans totaling $249 million and discovered a number of imprudent practices and documentation deficiencies with respect to the loans.[6]

---

**6.** The imprudent practices and deficiencies were listed as follows:

Twenty of these loans were found to have one or more characteristics which might qualify the loan as a real estate "investment" rather than a "loan" under generally accepted accounting principles.[7] And the examiners determined that "[a]s of December 14, 1984, Guaranty's portion of un-

recognized losses with respect to seven of these loans, aggregate $13,242,621. This total equal[ed] 96.7% of Guaranty's reported net worth as of November 30, 1984." Joint Exhibit 1, Vol. III at 640.

The FHLBB continued appraising the problem loans after the last examination

1. Imprudent Practices

| Item | Number of Instances |
|---|---|
| The appraisal report fails to meet requirements of Section 563.17–1(c)(1)(iii) and FHLBB Memorandum R–41b. | 20 |
| The appraisal report was prepared for the borrower rather than for the lender. | 15 |
| An appraisal report consistent with the loan purpose was not obtained. | 3 |
| The borrower(s)/guarantor(s) financial statements are unaudited. | 21 |
| Tax returns were not obtained for the borrower(s) and guarantor(s). | 12 |
| A pre-construction loan was funded prior to receipt of commitments for construction financing. | 1 |
| The borrower has little or no cash equity in the subject project. | 18 |
| Loan disbursements have been granted which are not consistent with the stated purpose of the loan. | 3 |
| Records do not contain evidence of property inspections during construction. | 2 |

2. Documentation Deficiencies

| Deficiency | Number of Instances |
|---|---|
| No loan application signed by the borrower disclosing the purpose of the loan and identification of the security property (Section 563.17–1(c)(1)(i)). | 19 |
| No signed statement by the borrower disclosing the price at which the real estate security is being purchased by the borrower (Section 563.17–1(c)(1)(ii)). | 14 |
| Appraisal reports do not contain sufficient information and data concerning the appraised property to substantiate the market value of the security property (Section 563.17–1(c)(1)(iii)). | 21 |
| No financial statement signed by the applicant, or a written credit report disclosing the financial ability of the applicant (Section 563.17–1(c)(1)(iv)). | 8 |
| No documentation showing when and by whom such loan was approved and the terms and conditions of such loan approval (Section 563.17–1(c)(1)(v)). | 19 |
| No documentation showing the date, amount, purpose and recipient of every disbursement of the proceeds of such loan, whether direct or indirect (Section 563.17–1(c)(1)(vi)). | 14 |
| No documentation showing that upon the closing of the loan, the borrower was furnished a loan settlement statement setting forth, in detail, the charges or fees which the borrower has obligated himself to pay in connection with the loan (Section 563.17–1(c)(1)(viii)). | 5 |

Joint Exhibit 1, Vol. III at 642–43.

7. The characteristics were listed as follows:

| Characteristic | Number of Instances |
|---|---|
| The "lender" assumes virtually all risk by providing all or substantially all of the funds, while the "borrower", although legally holding title, has little or no equity in the property. | 19 |
| The transaction is structured to maximize front-end profit recognition through the charging of commitment and/or other "loan fees" that are funded by the "lender". | 15 |
| Accrued interest is funded by the "lender" and is recognized as income throughout the term of the project. | 18 |
| Either there are no permanent take-out financing arrangements or the "lender" has agreed to convert the "loan" into some type of permanent financing upon construction completion. | 8 |
| The "lender" may be a profit participant, usually on a percentage basis, and upon the sale of the project may realize an "equity kicker". | 1 |

Joint Exhibit 1, Vol. III at 643.

report was transmitted and the Dallas branch of the FHLBB later directed Guaranty to establish loan loss reserves of $15.7 million on thirteen of the loans. Later, using the "generally accepted accounting principles" (GAAP) approach to loan loss revenues rather than the approach used by its Dallas branch, the FHLBB determined that Guaranty should recognize a loss of $18.6 million on the 13 loans.

By December 5, 1985, Guaranty had established loan loss reserves of only $1.5 million on these loans. When the FHLBB subtracted the difference between the loan loss reserve mandated under GAAP principles ($18.6 million) and the actual loan loss reserve established by Guaranty ($1.5 million) from Guaranty's reported net worth of $15.9 million as of October 31, 1985, it arrived at a negative net worth of almost $1.2 million. Based on this negative net worth figure, and on the substantial dissipation of assets caused by Guaranty's excessive use of brokered deposits and its imprudent loan and investment practices, the FHLBB appointed a receiver for Guaranty.

Guaranty argues that this action was arbitrary or capricious because the FHLBB: 1) should have used a more recent net worth figure to compute Guaranty's solvency, 2) improperly arrived at the loan loss reserve figure of $18.6 million, and 3) had no basis for determining that its allegedly unsafe or unsound savings solicitation and lending practices actually caused a substantial dissipation of assets. The FHLBB responds that: 1) it used the October 31, 1985 net worth figure from Guaranty's October monthly report because the October monthly report was the most recent monthly report available as of December 5, 1985, 2) it properly followed its own regulations and GAAP accounting methods in arriving at the appropriate loan loss reserves for the thirteen loans at issue, and 3) the facts clearly established that Guaranty had engaged in numerous unsound and unsafe practices and that these practices had caused a substantial dissipation of assets. The FHLBB's response to Guaranty's arguments is sound and is supported by the administrative record. We are convinced that the FHLBB did not act arbitrarily or capriciously in appointing a receiver for Guaranty.

Accordingly, we affirm the district court's dismissal of Guaranty's action.